[No. S004558, Crim. No. 23192. Nov. 17, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH EDWARD ADCOX, Defendant and Appellant.

214

216

220

222

**COUNSEL**

Fred Caploe, under appointment by the Supreme Court, and Linda F. Robertson for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert D. Marshall, Edmund D. McMurray, George M. Hendrickson, Ward A. Campbell and Michael T. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—Defendant Keith Edward Adcox was convicted of the first degree murder of David Orozco (Pen. Code, § 187),[1] robbery (§ 211), and grand theft auto (§ 487, subd. 3). The jury made an express finding "that the murder was willful, deliberate, and premeditated." Defendant was found to have personally used a firearm in the commission of the robbery. (§ 12022.5). Two special circumstance allegations under the 1978 death penalty law were found true: that the murder was committed while defendant was engaged in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(i)), and that the murder was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)). The jury fixed the penalty at death; this appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We conclude that the murder-for-financial-gain special circumstance must be set aside under *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]. In all other respects the judgment is affirmed.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

## I. GUILT PHASE

### A. FACTS

*Prosecution Case*

On May 23, 1982, defendant, age 20, his girlfriend Annette Tillery, age 16, and acquaintance Howard Love, age 18, left Modesto to go on a camping trip in Tuolumne County.[2] Defendant brought camping and fishing gear, a knife, and his .22 caliber rifle. The group purchased dried beans and potatoes with $23 obtained from Tillery's uncle. A friend of defendant's drove them to Twain Harte. They hitched a ride up the mountain to Mi-Wuk Village, continued walking toward Long Barn, and eventually left the highway and made camp. Defendant used his rifle to shoot at small animals near the campsite.

The following day they walked to a campground at Lyons Lake and set up camp in an undesignated area. Tillery and Love cut into a tent and stole canned foods. The manager told them to move to a proper camping space. According to Tillery, defendant became upset that evening. Fearing he was "going to do something," she put his rifle under her coat and took a walk with Love. Upon their return, Love unloaded the weapon. The group stayed at Lyons Lake for two days. When advised they would have to pay for the campsite, they moved on.

On the fourth day they walked to the north fork of the Tuolumne River and set up camp alongside a footpath paralleling the river bank. Defendant had possession of his rifle which he kept in his sleeping bag. The three ate meals of beans, potatoes and fish caught by defendant and Love.

On the fifth day, May 27, Tillery became tired of eating potatoes and fish and announced she wanted cinnamon rolls. She suggested selling her coat to get money for them, but defendant and Love said no. Two fishermen, Richard Smith and the victim, David Orozco, walked past the campsite at different times. Smith spoke briefly with defendant about the fishing. Tillery offered to use herself as "bait" to set one of the men up for a mugging. Defendant refused, stating he was not interested in her plan. At one point Tillery asked if she could leave to hitchhike home alone. She then suggested that they hit someone over the head and throw him into the river to get

---

[2] Tillery pled guilty to robbery in juvenile court and testified for the prosecution in exchange for immunity from prosecution for the murder. Love was separately charged with and convicted of murder, sentenced to life imprisonment, and did not testify at defendant's trial.

some money. The matter was discussed; defendant and Love ultimately agreeing to rob someone in that manner.

Tillery walked out to the dirt parking area, observed two vehicles: a Volkswagen Scirocco and a small truck, and reported back to defendant and Love. Richard Smith testified that he fished for about an hour and again exchanged a few words with defendant about the fishing as he walked past their campsite en route back to his truck. Love then went to the parking area and returned, reporting that the Volkswagen was now the only car left in the area. After further discussion it was agreed that defendant and Love would rob the victim "to get some money to get back home and transportation." Love asked Tillery, "Are you ready for this?" She replied, "I am." Defendant told Tillery to stay at the campsite. Defendant took his rifle, Love picked up a "club" from the ground, and the two walked off in the direction taken by David Orozco.

Defendant and Love were gone 30 to 45 minutes when defendant came running down the trail and stated to Tillery, "Let's get out of here." Tillery asked "if the guy was dead"; defendant replied that he did not know. Defendant and Tillery quickly gathered their belongings and headed for the dirt parking area. Love followed "shortly behind." Love had the keys to the Volkswagen. They loaded their gear into the vehicle and Love drove off, with defendant in the passenger seat and Tillery on his lap. Tillery testified that defendant had the victim's wallet. He removed the money and threw the wallet out of the car. Defendant told Tillery he had shot Orozco, that it was "horrible," and that "there was blood bubbling out of his nose and mouth."[3]

The group drove back to Modesto in the victim's Volkswagen. Defendant devised a plan to push the car into a canal. He enlisted the assistance of his brother, Michael Adcox, who was told to follow them to the canal in his own car to assist in disposing of "Love's" vehicle because "it had too many tickets on it." En route, defendant removed the in-dash stereo cassette player from the victim's car.

At the canal, defendant, Love and Tillery removed additional items from the vehicle, including the victim's red baby carrier, and placed them in Michael's vintage 1957 Chevrolet station wagon. Defendant and Love then pushed the car into the canal. Tillery was dropped off at her grandmother's house; she took her belongings and the baby carrier. When she asked defendant for some money, he obtained $5 from Love and gave it to her.

---

[3] On cross-examination, Tillery testifed that several days after the crimes, while at a friend's house, defendant told her he had not done the shooting.

Michael Adcox then drove defendant and Love to Love's father's residence in a trailer park. Defendant and Love told Michael not to tell anyone they were back in town. They offered to sell him the victim's car stereo for $50, but Michael declined. Defendant kept the stereo cassette player and gave it to friends with whom he was staying on the following day.

A farmer was disking his field on the evening of May 27 when he saw a vehicle partially submerged in the canal and a distinctive 1957 Chevrolet station wagon speeding away from the scene. He attempted to pull the Volkswagen from the water with his tractor and then notified the police of his find.

On the morning after the murder the body of David Orozco was discovered by another fisherman who alerted the Tuolumne County Sheriff's office. An autopsy was performed and a .22 caliber bullet removed from the victim's head. Sheriff's divers found defendant's .22 caliber rifle in the river 100 feet upstream from where the body was found. Criminalist William Chisum reviewed the crime scene and physical evidence, and conducted experiments in an attempt to reconstruct the shooting. It was clear from the evidence that the victim was kneeling, looking down, and placing a salmon egg on his fishhook when he was shot from behind. Powder burns and other evidence established that the muzzle of the rifle was between six and ten feet from the entry wound when the fatal shot was fired from a ledge of rocks overlooking the victim's position. The victim fell on his face onto a rock directly in front of where he was kneeling. Bloodstains evidenced that he had been rolled over while still alive. His wallet, car keys and vehicle were missing.

An all-points bulletin was put out for the victim's Volkswagen. The investigation focused on defendant when his father learned that a car matching the description of his son Michael's 1957 Chevy station wagon was seen speeding from the site where the victim's car was pulled from the canal. Defendant's father and brother went to the Stanislaus County Sheriff's office where Michael furnished a statement regarding his involvement in defendant's and Love's attempt to dispose of the car.

On May 30, Tuolumne County Sheriff's deputies executed a search warrant at Tillery's grandmother's house and recovered the baby carrier stolen from the victim's vehicle. As they were leaving, defendant and Tillery were observed walking down the street. Tillery was taken into custody; defendant fled and managed to escape. He was apprehended the following day at the home of friends with whom he had been staying. The stereo cassette player stolen from the victim's vehicle was seized from the house. Tillery initially gave a false statement; thereafter she furnished a second statement admit-

ting her role in the robbery and implicating defendant and Love in the crimes. She returned to the crime scene with police and also led them to the roadside location from which the victim's wallet was recovered.

At trial, the prosecution and defense entered into broad stipulations covering several major aspects of the People's case. The jury was told that the parties had stipulated to all of the following: that David Orozco was shot and killed on May 27, 1982; that the fatal bullet removed from his skull was fired by the .22 caliber rifle recovered from the river in the vicinity where his body was found; that defendant had brought the rifle into Tuolumne County on a camping trip; that on May 27 defendant, Love and Tillery left the scene near where the victim's body was found in the victim's vehicle; that defendant rode as a passenger in the vehicle to the location in Modesto where it was pushed into a canal; and that the car stereo introduced into evidence had been taken from the victim's vehicle. The rifle, the stereo, the bullet removed from the victim's head, and a photograph of the victim's vehicle were all stipulated into evidence without objection.

*Defense*

Defendant testified in his own behalf. Tillery was his girlfriend and slept with him during the camping trip. "Just about everything" Tillery testified to was true, although she lied in stating that he was upset on the first night of the trip and that she and Love had to take the rifle away from him.

On the day of the shooting, Tillery suggested that they knock a victim over the head and throw him into the river; "anything to get sweet rolls, rob them, whatever." Defendant admitted agreeing with Love and Tillery to rob Orozco "just to keep them quiet." He and Love walked to within 30 feet of the victim's position near the river bank. Defendant was armed with his rifle. Love had taken a "club" but dropped it "somewhere along the way"; defendant conceded he alone was armed when they approached the victim. They stood and watched Orozco for several minutes. Defendant decided he didn't want anything to do with the robbery, "sort of tossed" the rifle to Love, turned and ran. Three seconds later he heard a shot. Defendant walked back out of curiosity to see what had happened and saw blood coming from the victim's nose and mouth. He denied shooting the victim or taking his wallet. He denied throwing the rifle into the river or seeing who did; Love had it and could have done so.

Defendant was scared and ran back to camp. He and Tillery gathered up most of their belongings. As they were starting down the trail Love appeared and announced that he had the car keys. They loaded their gear into

the victim's car; Love drove, Tillery sat on defendant's lap in the passenger seat.

En route to Modesto, Love gave defendant the victim's wallet, telling him to remove the money (approximately $30) and throw the wallet away, which defendant did. When Tillery asked what had happened, defendant told her he shot Orozco. Defendant testified he did so because, "I thought it would make me look bigger to her in her eyes. I'm not sure."[4] Tillery suggested the car stereo could be sold, so defendant removed it. Love wanted to burn the vehicle. Defendant devised the plan to push it into a canal instead, enlisted his brother Michael's assistance, and personally helped push the vehicle into the water. Defendant testified he gave the car stereo to friends as payment for their letting him stay with them. Upon Tillery's arrest, defendant fled and escaped out of fear that authorities would not believe his side of the story. For similar reasons, upon his own arrest, when questioned by officers and confronted with Tillery's statement, he denied any complicity in the murder or even having been in Tuolumne County at the relevant times.

The defense also called Richard Carr, who while an inmate in the Tuolumne County jail, was allegedly told by Howard Love, "I'm here for first degree murder, I did it, I'm proud of it, if I had to, I would do it again." Carr recalled that Love said only that he "did it," not that he had personally shot the murder victim. Carr also testified that he viewed Love's statement as merely an attempt to establish a "tough guy" reputation at the jail. In a second conversation, Love told Carr that defendant had done the shooting.

## B. GUILT PHASE ISSUES

Defendant raises a number of contentions relating to the issue of guilt. None, as we shall show, warrants reversal.

### 1. *Change of Venue*

■■■ Defendant contends that the trial court erred in denying his motion for change of venue under section 1033 on grounds that pretrial publicity and strong community sentiment prejudiced potential jurors against him.[5]

---

[4] Defendant thereafter testified, as did Tillery, that several days after the incident he told her he had not done the shooting.

[5] The motion was denied pretrial, renewed during voir dire and again denied. Defendant twice unsuccessfully sought writs of prohibition in the Court of Appeal from each denial.

a) *Pretrial Publicity*

Section 1033 states in pertinent part: "In a criminal action . . . the court shall order a change of venue . . . [o]n motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial jury cannot be had in the county. . . ." ■ We have explained that "Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. [Citations.] The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. [Citation.]" (*People v. Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].) When our review is posttrial, we also examine the voir dire of both prospective and actual jurors to determine whether the pretrial publicity in fact had a prejudicial effect. (*Harris, supra,* at p. 949.)

■ Our evaluation of the record in consideration of these five factors satisfies us that defendant could obtain a fair and impartial trial in Tuolumne, the county of original venue. (*Frazier v. Superior Court* (1971) 5 Cal.3d 287, 293 [95 Cal.Rptr. 798, 486 P.2d 694].)

■ First, *the nature and gravity of the charged offense*—capital murder—must weigh heavily in our determination, for we have recognized that murder is a crime of the utmost gravity. (*People v. Harris, supra,* 28 Cal.3d at p. 948.) However, the sensationalism inherent in all capital murder cases will not in and of itself necessitate a change of venue. (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 942-943 [187 Cal.Rptr. 455, 654 P.2d 225].) We have recognized that "[i]t is . . . difficult to envision an eventual capital case which will not receive extensive media coverage, at least for a short period of time. If the early publicity attendant on a capital case alone suffices to raise a doubt as to the likelihood of a fair and impartial trial, a change of venue would perforce be required in every such case." (*Odle v. Superior Court, supra,* 32 Cal.3d at p. 942.)

■ "The peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'. . . ." (*Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582 [174 Cal.Rptr. 701, 629 P.2d 502].) Defendant states that "the homicide involved in the present case, viewed broadly, was rather unremarkable. . . ." He nevertheless asserts that, when viewed in context, the fact that the crime was committed in a "wilderness area" generated "extraordinarily strong feelings of fear and vulnerability" in rural Tuolumne County. The Attorney

General responds that "[e]ven the most urban counties have isolated areas which could arouse the same fears. . . ."

Although this "ambush of a fisherman" was a senseless and pitiless murder, we observe that it was not unusually atrocious or as overly sensational as were the multiple and bizarre serial killings which were the object of media attention in *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872 [101 Cal.Rptr. 411] and *Frazier* v. *Superior Court, supra*, 5 Cal.3d 287. Nor was it a crime involving sensational racial or sexual overtones. (See, e.g., *Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 593 [194 Cal.Rptr. 492, 668 P.2d 799].)

The second factor—*the nature and extent of the news coverage*—weighed against a change of venue. Defendant submitted only nine newspaper articles and one short letter to the editor in support of his motion.[6] Seven articles appeared in the Union-Democrat published in Sonora, Tuolumne County (average daily circulation approximately 8,500), and two articles appeared in the Modesto Bee (neighboring Stanislaus County—average daily circulation approximately 70,000). All of the articles were relatively brief, six were not printed as first page news, and all essentially reported a brief account of the crimes and subsequent procedural events (e.g., continuances of both defendant's and Love's trials). None of the articles was sensational in any way. The three lead articles appeared during the first week of June 1982, several days after the shooting and *ten months* prior to commencement of jury selection. The "letter to the editor," whose author expressed outrage at the crime and concern that "the lawyers are going to get [defendant] off," appeared alongside the television listings in the September 9, 1982, Union-Democrat *seven months* prior to jury selection, and there is no indication in the record that any juror, actual or prospective, read it. The last article appeared in that newspaper on December 22, 1982, *three months* prior to jury selection. Through the passage of time, any potential prejudice was thereby significantly reduced.

In short, the press coverage in this case was neither extensive nor inflammatory, and appears "no different in degree or intensity than the usual reporting of other homicides of the kind involved here." (*Odle* v. *Superior Court, supra*, 32 Cal.3d at p. 939.)

Nor was there any evidence of extensive or inflammatory pretrial media coverage. As a precaution against pretrial publicity, defendant's and Love's

---

[6]Indeed, defendant makes no general claim that the pretrial publicity was unusual, unfair or inflammatory. (See *People* v. *Balderas* (1985) 41 Cal.3d 144, 178 [222 Cal.Rptr. 184, 711 P.2d 480].)

preliminary hearing was ordered closed to the public. The trial judge thereafter ordered the transcripts sealed and imposed a gag order in the case.

The third factor—*size of the community*—weighed on the side of a change of venue in this case. "The smaller the community, the greater the likelihood the accused will not get a fair trial in a case of this nature." (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1131 [240 Cal.Rptr. 585, 742 P.2d 1306]; *Martinez* v. *Superior Court, supra,* 29 Cal.3d 574, 581.) It was uncontested below that the population of Tuolumne County at the time of the murder was 36,555. It is true, as the Attorney General points out, that at the time there were 15 less populous counties in California. (See Cal. Dept. Health Services, Vital Statistics of Cal.—983 (Mar. 1986) Table 1-4, p. 19.) But "[i]n *Fain* [*Fain* v. *Superior Court* (1970) 2 Cal.3d 46 (84 Cal.Rptr. 135, 465 P.2d 23)] at page 52, we determined that Stanislaus County, with a population of 184,600, was too small to dissipate the effects of extensive pretrial publicity. In *Frazier* [*Frazier* v. *Superior Court, supra,* 5 Cal.3d 287], we rendered the same finding with respect to Santa Cruz County which had a population of 123,700. And in *Steffen* v. *Municipal Court* [(1978)] 80 Cal.App.3d 623 [145 Cal.Rptr. 782], the court ordered a change of venue from San Mateo County, the 11th most populous county in the state with almost 600,000 residents." (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at pp. 581-582.)[7]

The fourth factor—*the status of the defendant in the community*—did not weigh in favor of a change of venue. Although defendant was not a resident of Tuolumne County, he was referred to in the articles only as a youthful "roofer" from Modesto. He was not associated with an organization or group which aroused community hostility (cf. *Frazier, supra,* 5 Cal.3d at 290 [community suspicion that "hippie" element was responsible for execution-type mass killings]). Like many other nonresidents frequenting the area to camp or fish, defendant appears to have been relatively anonymous in the community. (*People* v. *Jurado* (1981) 115 Cal.App.3d 470, 488 [171 Cal.Rptr. 509].)

The fifth factor—*the popularity and prominence of the victim*—was at best neutral. Although one of the newspaper articles reported that the victim

---

[7] We have noted that the smaller the community, the greater the likelihood the accused will not get a fair trial in a capital case (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1131). However, absent some concrete evidentiary showing that—due to the small size of a county alone—an impartial jury could not be obtained in a capital case originating within its boundaries, there is no basis for concluding that a more impartial panel could be convened in another locale. (Cf. *People* v. *Balderas, supra,* 41 Cal.3d 144, 180-181.) Stated otherwise, size of the community is but one of the factors to be considered under the *Harris* analysis. We must therefore reject any suggestion that a capital defendant could never receive a fair and impartial trial in a county as sparsely populated as Tuolumne.

was "very well liked in the community," he had moved to the area from San Jose only six months earlier. The Tuolumne County Sheriff was quoted in that same article as calling the murder a "freak, random-type killing that could have happened to anybody who'd been up there at that time." And although the press coverage did report that the victim was a Vietnam veteran who left behind a six-month-old daughter and pregnant wife, the tragedy of these circumstances would have struck the same sympathetic chord in any community. (*Odle* v. *Superior Court, supra,* 32 Cal.3d 932 at p. 942.)

We conclude that the balance of factors fails to establish a reasonable likelihood that defendant could not receive a fair trial in Tuolumne County. The fact that defendant was on trial for capital murder in relatively sparsely populated Tuolumne County weighed heavily in favor of a change of venue, but was not alone determinative. (*Odle* v. *Superior Court, supra,* 32 Cal.3d at pp. 942-943; *Martinez* v. *Superior Court, supra,* 29 Cal.3d at pp. 581-582.) As a recreational visitor to the county, defendant was relatively anonymous in the community. The victim had only recently moved into the area and enjoyed no particular prominence or notoriety. The press coverage was routine, neither extensive nor inflammatory, and did not prematurely disclose anything of evidentiary value in the case. Finally, the passage of time reduced the danger of prejudice from exposure to the articles.

We have further assessed the record of voir dire of the prospective and actual jurors to determine if the pretrial publicity had any prejudicial effect. ■ "[T]he controlling cases 'cannot be made to stand for the proposition that juror exposure . . . to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.' [Citation.] . . . 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].)" (*People* v. *Harris, supra,* 28 Cal.3d at pp. 949-950.)

■ It is true that several prospective jurors indicated they had heard discussion of the incident generally within their communities. However, five of the seated jurors had no prior knowledge of the case. Of the remainder, two knew no details, the others had only general knowledge through hearing or reading about the case, and each declared he had formed no opinion and could set aside whatever information he had received and decide the case on the evidence. Our review of the record in consideration of the *Harris* factors convinces us that "the jury was not influenced by any of the pretrial publicity and that defendant was not deprived of a fair and impartial trial by reason thereof." (*People* v. *Salas* (1972) 7 Cal.3d 812, 819 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)

b) *Community Sentiment*

In a separate argument, defendant asserts that the particular facts of this murder—"the killing of a man fishing alone in an isolated area"—independent of the pretrial publicity, itself generated such strong negative community sentiment as to preclude defendant from receiving a fair trial in predominantly rural Tuolumne County. We have already rejected this as a sole determinative factor in discussing the "nature and gravity of the offense" under the *Harris* factors. (*Ante*, at p. 231.) Moreover, none of the actual jurors who heard the case had expressed the view during voir dire that they found the circumstances of the murder unusually shocking. All but two of the jurors were themselves originally from metropolitan areas; none was a native of Tuolumne County.

Accordingly, we conclude that defendant's motions for change of venue were properly denied.

2. *Prosecutorial Misconduct—Guilt Phase*

■ Defendant contends that the prosecutor committed misconduct in his direct examination of Tillery. After she testified about her idea to sell her coat to get money for sweet rolls, the prosecutor asked her: "This is before any agreement to commit a robbery *or murder*, is that correct?" Defendant's objection on grounds that she had testified there was an agreement to commit robbery, not murder, was overruled.

In fact her testimony, subsequently corroborated by defendant, was that they all agreed to rob the victim by hitting him over the head *and throwing him into the river* in order to get money and transportation back home. The logical consequence of such a plan was the victim's demise. Thus the question as phrased was a reasonable interpretation of evidence properly before the jury. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1085 [80 Cal.Rptr. 567, 458 P.2d 479].) In any case, the jury was instructed that statements made by the attorneys during trial are not evidence.

■ Defendant asserts that the prosecutor committed numerous instances of misconduct in his closing argument at the guilt phase. The prosecutor argued: "The three of them [defendant, Love and Tillery] sat there in camp and discussed robbing David Lee Orozco. And they discussed hitting him on the head. And they discussed taking his money. And they discussed throwing him in the river. [¶] And ladies and gentlemen, that is a discussion of murder." Closing argument presents a legitimate opportunity to argue all reasonable inferences from evidence in the record. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396].) For the reasons

discussed above, we reject defendant's claim that such argument misstated the evidence.

■ Similarly, the prosecutor did not misstate the evidence in arguing that, when in the victim's car, defendant admitted to Tillery that he had murdered Orozco. When asked, "Did [defendant] say anything about the death of David Orozco?", Tillery testified defendant told her he had shot Orozco, that it was "horrible," and that "there was blood bubbling out of his nose and mouth." From such testimony an inference could fairly be drawn that defendant in essence admitted murdering the victim.

■ Next, defendant misplaces reliance on *People* v. *Kirkes* (1952) 39 Cal.2d 719 [249 P.2d 1], in claiming that it was misconduct for the prosecutor "to state facts to which non-testifying witnesses would have testified." The record lends no support to defendant's claim that in his closing argument "the prosecutor improperly characterized what the witnesses would have testified to but for the stipulation." In *Kirkes* we reiterated the well-settled rule that "statements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." (*Id.*, at p. 724.) There was no such misconduct here. The prosecution and defense had entered into broad stipulations covering several major aspects of the physical evidence in the case (*ante*, p. 229), and therefore the prosecutor argued to the jury: "I didn't have to call witnesses to establish any one of those things that were considered in that stipulation." Defense counsel himself conceded the propriety of such argument, objecting only to the prosecutor's further statement that testimony of 20 witnesses to prove the stipulated facts had been spared (a matter which had already been explained to the jury by the trial judge). Moreover, counsel never requested an admonition to lessen any possible prejudicial effect he perceived such argument might have on the jury. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

■ Defendant next contends that the prosecutor, through "expressions of personal belief" during opening and closing arguments," impermissibly "cast his own testimonial doubts on [defendant's] version of the affair."

■ A prosecutor may not express a personal opinion or belief in a defendant's guilt "where there is substantial danger that jurors will interpret this as being based on information at the prosecutor's command, other than evidence adduced at trial." (*People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) ■ We have scrutinized the prosecutor's arguments and find no such misconduct. "[E]xamination of his arguments to the jury demonstrates that he was merely presenting his views of deductions and inferences warranted by the evidence." (*People* v. *Pineiro*

(1982) 129 Cal.App.3d 915, 924 [179 Cal.Rptr. 883].) In most of the complained-of instances he merely used the pronoun "I" (e.g., "The term reasonable doubt, look at the instruction, and after you've weighed the evidence, can you really say in good conscience that there is a reasonable doubt as to the guilt of the defendant. *I don't see that you can*" (italics added)). Such phraseology hardly establishes that he was impermissibly injecting his own personal beliefs into his argument. (*Pineiro, supra*, at p. 924.) In any event, defendant raised no objection, hence the claim is waived on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 34.)

■ Nor was it misconduct for the prosecutor to characterize defendant's version of the incident as "fabrication, and I believe it is a fabrication as the evidence shows it to be, of trying to abandon the crime."

It is long settled that a prosecutor may use appropriate epithets warranted by the evidence. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) Characterization of defendant's claim of abandoned intent as "fabrication" was fair comment on the state of the evidence, which included defendant's own testimony that he initially agreed to rob Orozco, the circumstance that the fatal bullet was fired from his rifle with which he admittedly was armed, his admission to Tillery that he shot the victim, his possession of the victim's wallet according to her testimony, his complicity in the theft of the victim's car after the murder, and his removal of the car stereo and personally devised plan to dispose of the vehicle. So too did these facts support the prosecutor's use of the epithet "cold-blooded murder."

The portions of the argument to which defendant has directed us fail to support his further claim that the prosecutor attempted to impugn defense counsel's honesty and integrity by suggesting he improperly conspired with defendant to fabricate the defense. (Compare *People* v. *Bain, supra*, 5 Cal.3d at p. 847 [unsupported implication that defense counsel fabricated a defense]; see *People* v. *Ghent* (1987) 43 Cal.3d 739, 762 [239 Cal.Rptr. 82, 739 P.2d 1250].) Failure to object to this line of argument has waived any claim of misconduct on appeal. (*Green, supra*, 27 Cal.3d at p. 34.)

■ There is no merit to defendant's claim that it was misconduct to argue to the jury that under the felony-murder rule, "If you are involved in the commission of the robbery, and the murder occurs, whether it's intentional or not, you had the intent to rob, that is first degree murder." Such was an accurate statement of the law. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 476-477 [194 Cal.Rptr. 390, 668 P.2d 697].)

■ Finally, defendant seeks to overcome the waiver rule by asserting that in those instances where counsel failed to object to the prosecutor's

alleged misconduct, or failed to request a curative admonition, such omissions deprived him of the effective assistance of counsel. (*People* v. *Fosselman, supra*, 33 Cal.3d at p. 584.) We have found no misconduct. Even were we to conclude otherwise, none of the claimed errors were of such significance that it is reasonably probable the jury would have reached a more favorable result but for counsel's omissions. (*Ibid.*)

3. *Admission of Tillery's Testimony*

 Defendant maintains that Tillery's testimony was erroneously admitted because the trial court found the plea bargain she entered into with the district attorney was "unconstitutional."

 "[A]lthough there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid. [Citations.]" (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1252 [232 Cal.Rptr. 849, 729 P.2d 115].)

The record establishes that Tillery agreed to testify truthfully for the People "at all hearings and/or trials" in defendant's prosecution, in exchange for immunity from prosecution for the murder and acceptance of her guilty "plea" to robbery in juvenile court. The written terms of the plea bargain expressly provided only that "if any of her statements or testimony proved to be untruthful, then the above bargain would be rescinded."

At the time of defendant's trial, Tillery had already admitted the truth of the robbery petition pursuant to the terms of the plea bargain and been sentenced to the California Youth Authority. Relying on *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133], and *People* v. *Green* (1951) 102 Cal.App.2d 831 [228 P.2d 867], defendant moved to exclude Tillery's testimony on grounds that, under the plea bargain, she would feel pressured to testify in conformance with her earlier statement to police, or her preliminary hearing testimony, in order to ensure that the terms of her plea bargain would remain in effect.

In *Medina* it was held that "a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (*People* v. *Medina, supra*, 41 Cal.App.3d at p. 455.) "Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police ([*Medina,* ] *id.*, at p. 450), or that his testimony result in the defendant's conviction ([*Green, supra,*] 102

Cal.App.2d 831, 837-839), the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial." (*People* v. *Allen, supra,* 42 Cal.3d at pp. 1251-1252, fn. omitted.) We have recognized that these principles are equally applicable to plea bargain agreements. (*Id.,* at p. 1252, fn. 5, and cases cited.)

■■■ *Medina* and *Green,* however, are distinguishable from the instant case. Nothing in Tillery's plea bargain resembles the evils inherent in the immunity agreements condemned in those cases. Nothing in the record suggests Tillery was ever told or led to believe that the benefits of her plea bargain would remain in force only if she testified in conformity with her statements to police or her preliminary examination testimony. Nor did the trial court so find; it did not determine Tillery's plea bargain to be unlawfully coercive or "unconstitutional." Rather, the court was concerned that the prosecution not be permitted to repudiate the plea bargain should Tillery's trial testimony prove at variance with that which she gave at the preliminary examination. For that reason, the court ruled that her prior testimony could not be used by the People for impeachment purposes, nor as a basis for a collateral prosecution for perjury.[8]

The fact that Tillery may have felt some inherent compulsion to testify in accord with her earlier testimony does not, in itself, render the agreement invalid. (*Allen, supra,* 42 Cal.3d at p. 1253.) There was substantial evidence presented by the People which more than met the corroboration requirement for Tillery's testimony. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) Crucially, defendant himself testified that "just about everything" Tillery testified to was true. We conclude that Tillery's plea bargain was not unlawfully coercive, and that admission of her testimony did not deny defendant a fair trial.

## 4. *Sufficiency of Evidence of Premeditation and Deliberation*

■■■ Defendant contends there was insufficient evidence to support an instruction on willful, premeditated first degree murder.

---

[8] The trial court's concerns were unfounded, and its ruling in this regard misplaced. As noted, Tillery's plea bargain was validly conditioned only on her truthful and complete testimony in all proceedings against defendant. (*People* v. *Allen, supra,* 42 Cal.3d at pp. 1252-1253; *People* v. *Fields* (1983) 35 Cal.3d 329, 360-361 [197 Cal.Rptr. 803, 673 P.2d 680].) But the plea bargain was *not* in effect at the time she gave her preliminary examination testimony. Thus, "it could [not] be argued [s]he was under a strong compulsion to testify the same way at trial . . . [on the theory that] if [s]he told a different story at defendant's trial [s]he would necessarily have given untruthful testimony in one of the two proceedings and the plea agreement could be terminated by the district attorney's office." (*People* v. *Allen, supra,* 42 Cal.3d at pp. 1253-1254; see *People* v. *Fields, supra,* 35 Cal.3d 329, 361.)

■■■ In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], we identified three categories of evidence which might sustain a finding of premeditated murder: (1) facts showing prior *planning* of the killing; (2) facts about any prior relationship or conduct with the victim from which the jury could infer a *motive*; and (3) facts about the *manner of the killing* from which the jury could infer that the defendant intentionally killed the victim according to a preconceived plan. (*Id.*, at pp. 26-27; *People* v. *Miranda, supra*, 44 Cal.3d at p. 86.)

■■■ In reviewing the sufficiency of the evidence, we must draw all inferences that can be reasonably deduced in support of the verdict and must uphold the judgment if, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

■■■ The record here shows evidence of willful premeditation under each of the three *Anderson* categories. There was evidence of prior planning. "[T]he fact that defendant brought his loaded gun . . . [to the victim's position on the river bank] and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance." (*People* v. *Miranda, supra*, 44 Cal.3d at p. 87.) The preconceived plan to rob the victim *and throw him into the river* further supports that inference.

Defendant's *motive* was robbery. The evidence showed a preconceived plan to rob the victim, in Tillery's words, "to get some money to get back home and transportation." That defendant and his cohorts planned to steal the victim's vehicle as a means of flight back to Modesto with the proceeds of the robbery lends further support to the inference that the victim's demise was intended.

The manner of killing—a single fatal shot to the back of the head of the unarmed victim from a distance of six to ten feet as he kneeled, baiting his fishhook—further establishes that the shooting was conceived in advance. The evidence showed that defendant and Love crept up to a ledge of rocks and then onto a boulder overlooking the unwitting victim's position. Defendant testified Love had dropped his club and that he (defendant) alone was armed as they approached the victim.

We conclude that the evidence, viewed in the light most favorable to the People, supports the jury's verdict of willful, deliberate and premeditated first degree murder.

### 5. *CALJIC No. 2.27 and the Corroboration Requirement for Accomplice Testimony*

Defendant contends that CALJIC No. 2.27, which instructs the jury that the testimony of one witness is sufficient for the proof of any fact, misled the jury as to the need for corroboration of accomplice Tillery's testimony.

In *People* v. *Chavez* (1985) 39 Cal.3d 823 [218 Cal.Rptr. 49, 705 P.2d 372], we held that the giving of CALJIC No. 2.27 in conjunction with accomplice instructions was not error per se, but we agreed with the suggestion of the Court of Appeal in *People* v. *Stewart* (1983) 145 Cal.App.3d 967, 975 [193 Cal.Rptr. 799], that it should contain an explicit reference to testimony requiring corroboration. (*Chavez, supra,* 39 Cal.3d at p. 831.)

As in *Chavez,* here, looking to the instructions as a whole we find no error. (39 Cal.3d at pp. 830-831.) The full panoply of standard CALJIC instructions on accomplice testimony and the requirement of corroboration was given here. Both the prosecution and the defense proceeded on the premise that corroboration was needed. (*Id.,* at p. 831.) In his opening statement and closing argument, the prosecutor referred to the accomplice instructions, acknowledged that Tillery was an accomplice, and argued that her testimony was amply corroborated by the evidence. Defendant's own testimony supplied the requisite corroboration; he acknowledged that "just about everything" Tillery testified to was true. "As a result, the jury was not misled as to the need for corroboration and no prejudice resulted. The emphasis placed on the corroboration requirement, and on the other accomplice instructions, demonstrates that the jury was properly instructed on the proper standard of evaluating [Tillery's] testimony." (*Ibid.*)

### 6. *Instruction Pursuant to CALJIC No. 8.75*

Pursuant to CALJIC No. 8.75 (1982 New), the jury was instructed as to how to proceed in returning verdicts with respect to the charge of first degree murder and the lesser included offense of murder in the second degree.

CALJIC No. 8.75 was derived from *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809]. In *Stone,* the jury had unanimously concluded the defendant should be acquitted of murder, but remained deadlocked on the lesser included offenses of voluntary and involuntary manslaughter. (*Id.,* at p. 509.) We were concerned with formulation of a procedure for the receipt of a partial verdict consistent with the double

jeopardy clause. Accordingly, we held that a trial court must permit entry of a verdict of acquittal on the greater charge when the jury has reached unanimous, final agreement on acquittal, but remains deadlocked on lesser included offenses. (*Id.,* at pp. 514-519.)

We have since clarified that our holding in *Stone* does not preclude a jury from *considering* lesser offenses during its deliberations. (*People* v. *Kurtzman* (1988) 46 Cal.3d 322, 329 [250 Cal.Rptr. 244, 758 P.2d 572].) Nor does CALJIC No. 8.75 purport to instruct the jury to determine whether the defendant is guilty of the greater offense before "considering" any lesser offense. (*Id.,* at pp. 330-331.) Moreover, CALJIC No. 17.10, also given here, instructs that "[i]f the jury is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged and it unanimously so finds, it may convict him of any lesser offense, the commission of which is necessarily included in the offense charged, if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense."

The only lesser included offense herein concerned was second degree murder; there were no manslaughter instructions. Thus, defendant's guilt of either offense turned only on a finding of premeditation and deliberation. There is nothing in the record of deliberations to suggest that the jury had great difficulty, or was divided, on the proof and existence of this element. There was no request for a rereading of testimony. The jury commenced deliberations at 2:45 p.m. on June 2, 1983; by 11 a.m. the following morning they had reached a unanimous verdict of willful, deliberate and premeditated first degree murder. Finally, the jury was instructed in the exact language of CALJIC No. 8.75; there was no further embellishment by the court advising them not to "consider" or deliberate upon the lesser offense of second degree murder before reaching a verdict on the greater charge. Accordingly, no error is shown.

### 7. *CALJIC No. 2.90—Reasonable Doubt Instruction*

Defendant next contends that CALJIC No. 2.90 (1979 Rev.), the standard instruction defining the presumption of innocence, the state's burden of proof, and reasonable doubt, is "unintelligible." Acknowledging that the language of the instruction is taken verbatim from section 1096, and without proffering any authority in support of his position, he nevertheless urges us to declare the instruction and statute unconstitutional.

We long ago declined the invitation. Since CALJIC No. 2.90 is a verbatim copy of a statute—section 1096—the remedy for any perceived deficiency in that section's codification of the "reasonable doubt" standard is not judicial but legislative. (See *People* v. *Brigham* (1979) 25 Cal.3d 283,

290, fn. 11 and 293 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. by Mosk, J.).)

### 8. *Jury Unanimity on Theory of First Degree Murder*

 Defendant maintains that the jury should have been required to unanimously agree on the theory of first degree murder underlying its verdict. We have long since rejected this argument: "[I]n a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute." (*People* v. *Milan* (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Chavez* (1951) 37 Cal.2d 656, 670-672 [234 P.2d 632].)

Moreover, the verdict in this case was unanimous as to theory, the jury having found defendant guilty of first degree murder "other than under the felony murder rule, to-wit: that the murder was willful, deliberate, and premeditated," and having further found that he personally used a firearm in its commission.

### 9. *Beeman Error*

 Defendant contends that the court committed prejudicial error in failing to instruct on intent with regard to accomplice liability for the crimes. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) The standard CALJIC aiding and abetting instructions found deficient in *Beeman* were given here. Former CALJIC Nos. 3.00 and 3.01 were erroneous "because they did not advise the jury that conviction as an aider and abettor required not only that the defendant have knowledge of the criminal purpose of the perpetrator of the offense, but also that the defendant share that purpose or intend to commit, encourage, or facilitate the commission of the crime." (*People* v. *Croy* (1985) 41 Cal.3d 1, 11-12 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Caldwell* (1984) 36 Cal.3d 210, 223-224 [203 Cal.Rptr. 433, 681 P.2d 274]; *People* v. *Beeman, supra*, 35 Cal.3d 547, 560.)

 Prejudice from *Beeman* error is assessed under the *Chapman* "harmless beyond a reasonable doubt" test. (See *People* v. *Dyer* (1988) 45 Cal.3d 26, 60-64 [246 Cal.Rptr. 209, 753 P.2d 1].) However, in this instance we need not employ such review, for we have recognized that "in some circumstances it is possible to determine that although an instruction . . . was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, prop-

erly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant. . . ." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 335 [185 Cal.Rptr. 436, 650 P.2d 311].)

 Defendant was found guilty of "willful, deliberate, and premeditated" first degree murder. The jury further found that in the commission of the robbery defendant had personally used a firearm within the meaning of section 12022.5. In light of that finding, it is clear the jury conclusively determined defendant to be the actual killer. They were instructed the finding could be found true only if defendant personally used the firearm in the commission of the robbery, and were expressly told that the aiding and abetting instructions did not apply to the firearm-use finding. The term "used a firearm" was defined as: "to display a firearm in a menacing manner, *intentionally to fire it,* or intentionally to strike or hit a human being with it." (CALJIC No. 17.19 (1980 Rev.), italics added.) Here, the rifle was never displayed to the victim in a menacing manner, nor was he struck with it. Rather, he was ambushed from behind as he kneeled baiting his hook, and felled with a single bullet to the back of his head. Since defendant was found to be the actual killer who personally, intentionally fired the fatal shot, the aiding and abetting instructions given here had no effect upon the guilty verdict.

10. *Ineffective Assistance of Counsel at the Guilt Phase*

We have already rejected the claim of ineffective assistance of counsel regarding failure to object to alleged prosecutorial misconduct at the guilt phase. (*Ante,* pp. 237-238.) In a separate argument, defendant raises five additional claims of ineffective assistance of counsel. As will be shown, none is meritorious.

First, defendant argues that Attorney Victor Lamb, who represented him briefly early in the proceedings in superior court and prior to appointment of trial counsel Paul Giudice, rendered ineffective assistance in failing to move for a change of venue. Since trial counsel thereafter raised the motion pretrial and renewed it during voir dire, and since we have found no error in the court's denial of a change of venue (*ante,* pp. 230-234), Attorney Lamb's omission did not prejudice defendant's case. (*People* v. *Fosselman, supra,* 33 Cal.3d 572.)

Next, Tillery testified at the preliminary hearing that one evening early in the camping trip, defendant had complained about headaches and possible

ulcers and was crying while holding his loaded rifle. She and Love became concerned, took the gun from defendant and unloaded it. At trial, on direct examination regarding the episode, Tillery testified that defendant was upset, that she and Love "thought he was going to do something, so we took [the gun]," and that she put it under her coat, after which Love unloaded it. ■■■ Defendant argues that the clear inference from Tillery's preliminary hearing testimony was that defendant was emotionally distraught, perhaps suicidal, and that trial counsel was ineffective in failing to fully develop such facts in his cross-examination of Tillery at trial.

The argument overlooks the fact that defendant claimed "just about everything" Tillery had testified to was truthful, with one exception. He testified she lied in stating that he was upset on the night in question, and that she and Love had to take his rifle away from him. Such being his testimony, trial counsel can hardly be faulted for not eliciting further testimony from Tillery which would have directly contradicted and impeached his client's story.

■■■ Defendant next asserts trial counsel was ineffective in failing to investigate a prior hunting accident in which defendant accidently shot himself in the head. It is asserted that Tillery's testimony that defendant was emotionally distraught and experiencing headaches during the camping trip would have "take[n] on added dimension" had the fact of his prior head injury been brought out at trial.

The only information in the record alluding to the injury is found in the probation report, in which it is stated: "Prior to quitting school, the defendant accidentally shot himself in the head when a pistol discharged while he was hunting. He was out of school for approximately four months and got behind and it was at that time he started ditching school." The report was prepared nearly a month after the trial. The source of the information regarding defendant's injury is not indicated. The record is completely silent as to whether trial counsel knew of the fact of the injury at the time of trial, whether medical documentation or evidence existed to substantiate it, its nature and severity, whether there was full recovery, and whether, if counsel was in fact alerted to its existence, there was a valid tactical reason for its omission at trial.[9]

In view of the inadequacy of the record on appeal we are unable to discern why counsel failed to act in the manner challenged. This claim of ineffective assistance must therefore be rejected on appeal. (*People* v. *Pope*

---

[9] It is noteworthy that although defendant's mother testified on his behalf at the penalty phase, she made no mention of defendant's alleged accidental head injury, or any resultant emotional disorder, in support of his case for life imprisonment.

(1979) 23 Cal.3d 412, 426, 428 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Defendant also faults counsel for failing to object to his cross-examination regarding his statement to police, on grounds that the prosecutor had failed to foundationally establish that he had been admonished per *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). Since the record is silent on whether there was a *Miranda* waiver, the claim must be rejected on appeal. Given that trial counsel skillfully obtained an overly generous ruling excluding the taped statement from the People's case-in-chief, it can be inferred that, had there been a *Miranda* violation, counsel would have challenged the statement on such ground.

 Lastly, there is no merit to defendant's claim that counsel's failure to request a pinpoint *Sears* instruction (*People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847]) relating specific evidence to his "lack of motive to kill" prejudiced the verdict. Defense counsel argued exhaustively to the jury that Tillery, not defendant, had the motive to rob the victim, and that defendant had no motive to kill. The facts were not complicated, and thus the relevance and materiality of the circumstantial evidence were readily apparent to the jury. (*Id.,* at p. 190.)

## C. SPECIAL CIRCUMSTANCE ISSUES

### 1. *Murder-for-financial-gain Special Circumstance*

The jury found true two special circumstances: felony-murder-robbery (§ 190.2, subd. (a)(17)(i)) and that "[t]he murder was intentional and carried out for financial gain" (§ 190.2, subd. (a)(1)). Defendant correctly contends that the latter special circumstance finding is invalid on these facts.

In *People* v. *Bigelow, supra,* 37 Cal.3d 731, "We adopt[ed] a limiting construction under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Id.,* at p. 751.)

The present case does not fall within the financial-gain special circumstance as so limited. Orozco was robbed of his wallet and car and murdered in the course of the robbery. It cannot be said that the murder was an "essential prerequisite" to the robbery. The financial-gain special circumstance must therefore be set aside.

### 2. *Intent to Kill (Carlos Error)*

■■■■ Defendant contends that the felony-murder-robbery special circumstance must be set aside on the ground that the court failed to instruct on intent to kill. In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that intent to kill is an element of the felony-murder special circumstance of the 1978 death penalty law, whether applied to accomplices or to actual killers. (*Id.,* at pp. 153-154.)

We have since overruled *Carlos* in *People* v. *Anderson, supra,* 43 Cal.3d 1104, wherein we held that, with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. ■■■■ Such an instruction is required only where there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. (*Id.,* at pp. 1138-1139.)

■■■■ Defendant argues that the court should have so instructed the jury here. The claim, however, is unavailing. The jury found defendant guilty of "willful, deliberate and premeditated" first degree murder; such a verdict "necessarily embraces" a finding of intent to kill. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 762; *People* v. *Phillips* (1985) 41 Cal.3d 29, 59 [222 Cal.Rptr. 127, 711 P.2d 423].) They further found that defendant had personally used a firearm in the commission of the robbery and intentionally fired the fatal shot, thereby determining that he was the actual killer. Finally, they found the murder intentional in conjunction with the murder-for-financial-gain special circumstance. (See *People* v. *Garcia* (1984) 36 Cal.3d 539, 555, fn. 11 [205 Cal.Rptr. 265, 684 P.2d 826].)

### 3. *Accomplice Corroboration and the Firearm-use and Special Circumstance Allegations*

■■■■ Defendant argues it was prejudicial error for the court to have failed to instruct sua sponte that Tillery's testimony as it related to the firearm-use and special circumstance findings was also subject to the requirement of corroboration for accomplice testimony (§ 1111). No such special instruction was required.

Defendant's argument assumes that the jury was told to differentiate between Tillery's testimony as it tended to prove his guilt of the crimes, and the truth of the firearm-use and special circumstance findings. No such distinction was made or required. Section 190.4, subdivision (a), provides in relevant part: "Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged

and proved pursuant to the general law applying to the trial and conviction of the crime."

The jury was given all the standardized CALJIC instructions defining an "accomplice" (CALJIC No. 3.10), advising that Tillery was an accomplice as a matter of law (CALJIC No. 3.16), and explaining that her testimony had to be viewed with distrust (CALJIC No. 3.18) and needed to be corroborated (CALJIC Nos. 3.11 and 3.12). Both the prosecution and the defense proceeded on the premise that corroboration was needed. In his opening statement and closing argument, the prosecutor referred to the accomplice instructions, acknowledged that Tillery was an accomplice, and argued that her testimony was amply corroborated by the evidence. Defendant's own testimony supplied the requisite corroboration; he acknowledged that "just about everything" Tillery testified to was true.

Taken as a whole, the instructions and arguments apprised the jury that Tillery's testimony, on whatever subject—the commission of the crimes, or the truth of the related firearm-use and special circumstance findings—required corroboration and was to be viewed with distrust. (Cf. *People* v. *Espinoza* (1979) 99 Cal.App.3d 44, 48-49 [159 Cal.Rptr. 803].)

## II. PENALTY PHASE

### A. FACTS

*Evidence in Aggravation*

At the penalty phase, by stipulation, the prosecution introduced documentary evidence of three prior felony convictions as aggravating circumstances. (§ 190.3, factor (c).) These included convictions on January 18, 1980, of shooting at an inhabited dwelling (§ 246) and driving under the influence of alcohol resulting in bodily injury (former Veh. Code, § 23101), for which crimes defendant was committed to the California Youth Authority, and a conviction on April 2, 1980, of receiving stolen property (§ 496), for which offense he was also sentenced to the Youth Authority.

*Evidence in Mitigation*

Phyllis Adcox, defendant's mother, testified that defendant, the eldest of her three sons, had lived at home most of his adult life. He completed school through the 11th grade, and was committed to the California Youth Authority in 1980-1981. While at the Youth Authority he went to school; after his release he enrolled in a junior college. Thereafter he worked in the CETA program until obtaining employment as a roofer for Valley Roofing.

Defendant would give most of his paycheck to the family for rent and food. To her knowledge defendant was a good and regular worker. Prior to dropping out of school, defendant had attended church regularly with his family.

Tuolumne County Deputy Sheriff Robert Mildenberger testified that while confined in the Tuolumne County jail, defendant was a good inmate who followed jail policy, never got into fights, and had no disciplinary actions taken against him. When defendant was housed in an isolation cell, Mildenberger arranged to have a television set brought in for him.

Kenneth Coombs, owner of Valley Roofing and defendant's former employer, testified that defendant started out as a common laborer and advanced to "almost a journeyman roofer" before being laid off due to a work shortage. Coombs found defendant to be a courteous, good, reliable worker who always got along with his coworkers. He recalled that defendant once turned down an offer to work for more pay at another roofing company in order to stay with Valley Roofing; on another occasion defendant kept working in the hot sun despite a recurrent nosebleed. Coombs stated he would rehire defendant if he needed a good man.

Kenneth Coombs's wife Viola testified that defendant would pick up his paycheck at their house and was always very nice and courteous. On occasion defendant did some yard work for them. There were no problems with tardiness or absences except when defendant had to report to his probation officer.

## B. PENALTY PHASE ISSUES

### 1. *Use of Peremptory Challenges to Exclude Prospective Jurors Expressing Reservations About the Death Penalty*

█ Defendant argues that his death sentence must be reversed because the prosecutor improperly exercised peremptory challenges to excuse prospective jurors who—although not excusable for cause under *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]—nevertheless expressed reservations about the death penalty. We have rejected the argument in *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on other grounds in *People v. Anderson, supra,* 43 Cal.3d at page 1145, wherein we found "no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty." (37 Cal.3d at p. 315.)

## 2. *Witherspoon/Witt Error*

■ Defendant contends that the trial court erred in excluding three prospective jurors because—contrary to the rule in *Witherspoon* v. *Illinois, supra*, 391 U.S. 510—each failed to make it *unmistakably* clear that they would *automatically* vote against the death penalty without regard to the evidence produced at trial. (*Id.,* at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785]; see *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 10-11 [168 Cal.Rptr. 128, 616 P.2d 1301]; *People* v. *Velasquez* (1980) 26 Cal.3d 425, 436 [162 Cal.Rptr. 306, 606 P.2d 341].)

The *Witherspoon* standard has been substantially modified by the United States Supreme Court in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. "As we observed in *People* v. *Allen* [*, supra,*] 42 Cal.3d 1222, 1275, *Witt* adopted a new review standard, namely, 'whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon's* reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." ' (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], quoting from *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 100 S.Ct. 2521].)" (*People* v. *Ghent, supra*, 43 Cal.3d at p. 767.)

In *Ghent* we held that "[b]ecause we think *Witt's* review standard and underlying rationale make good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopt the *Witt* standard." (*People* v. *Ghent, supra*, 43 Cal.3d at p. 767.)

In the present case, under the *Witt* standard or the stricter *Witherspoon* test, none of the three prospective jurors (Cory, Brueckner and Lovell) was improperly excused for cause. Each unequivocally voiced an "inflexible inability" to impose the death penalty. (*Ghent, supra*, 43 Cal.3d at p. 768.) During her voir dire, prospective juror Cory said of the death penalty, "[I]t seems it could be handled without—punishment could be dealt with in some other way without death." When asked, "Can you think of any type of case where death would be warranted?", she replied, "No, sir." Prospective juror Brueckner stated on voir dire that she hoped defendant could be rehabilitated and "under no circumstances" would vote for the death penalty in this case. Venireman Lovell stated he would never impose the death penalty in any case.

We conclude that none of the prospective jurors was improperly excused under the *Witherspoon* standard in effect at the time of trial. It follows that none of them was improperly excused under the less strict standard of *Wainwright* v. *Witt, supra*, 469 U.S. at page 424 [83 L.Ed.2d at page 851-852].

### 3. *Denial of a Representative Jury*

■■■ Defendant contends that the exclusion for cause of prospective jurors automatically opposed to the death penalty deprived him of his Sixth Amendment right to a jury chosen from a representative cross-section of the community. We have rejected this claim. (*People* v. *Ghent, supra*, 43 Cal.3d at pp. 753-754; *People* v. *Fields, supra*, 35 Cal.3d 329, 342-353 (plur. opn.), 374-375 (conc. opn.); see also *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

### 4. *Constitutional Challenge to the 1978 Statute*

Defendant asserts that the 1978 statute is unconstitutional because (1) the statutory aggravating and mitigating circumstances enumerated in section 190.3 "are so vague as to result in inconsistency in the imposition of the death penalty"; (2) no written findings are required as to the jury's basis for imposing the death penalty; and (3) it fails to require the jury to find *beyond a reasonable doubt* that the aggravating factors outweigh those in mitigation, and that death is the appropriate penalty. We have recently rejected identical constitutional attacks on each of these asserted grounds. (See *People* v. *Allen, supra*, 42 Cal.3d at p. 1285; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P2d 113]; *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], vacated on other grounds *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]; see also *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1195-1196, vacated and remanded on other grounds, *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

### 5. *Effect of Invalid Special Circumstance*

■■■ Relying on *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], defendant argues that the jury was erroneously permitted to consider both the financial-gain and felony-murder-robbery special circumstances at the penalty phase, because each was based upon an indivisible course of conduct having one principal criminal purpose. (*Id.,* at pp. 63-65.)

We have already determined that the financial-gain special circumstance was invalid under *Bigelow, supra*, 37 Cal.3d 731, and must be set aside. In

light of our determination to uphold the felony-murder-robbery special circumstance, the jury's consideration of the invalid financial-gain special circumstance at the penalty phase was undoubtedly harmless error. (Cf. *People* v. *Allen, supra,* 42 Cal.3d at pp. 1281-1282.) Both special circumstances were grounded on a single, uncomplicated factual occurrence: the robbery of the victim's wallet and car accomplished by murder. Given the similarity of proof on these facts for the two special circumstance findings, the additional and erroneous "financial gain" finding could not have affected the jury's verdict. (See *People* v. *Wade* (1988) 44 Cal.3d 975, 998 [244 Cal.Rptr. 905, 750 P.2d 794].)

6. *Failure to Voir Dire on Alleged Juror Misconduct*

 Defendant contends that the trial court erred in failing to voir dire the jury sua sponte on their exposure to certain newspaper articles which surfaced during trial. Trial counsel claimed that quotes from the prosecutor which allegedly appeared in the articles reflected that he had violated the gag order earlier imposed in the case. Although counsel accused the prosecutor of being in contempt of the order, he declined the court's invitation to initiate formal contempt proceedings.

Counsel did orally move for a mistrial on this ground. However, he did not affirmatively allege that any juror had in fact seen the newspaper articles. He submitted the articles to be marked as exhibits but did not thereafter seek to admit them into evidence; as a result they are not found in the record on appeal. Finally, counsel never requested that the jurors be voir dired to investigate the potential claim of misconduct.

We have found only two references to the contents of the articles in the record of the *in limine* hearing on the motion. At one point defense counsel stated in reference to the prosecutor: "Did you see what he is quoted as saying? 'I had a roomful of witnesses that I cannot produce, there was an argument by Mr. Giudice [defense counsel],' or words to that effect. Direct interview. That is violative of this court's order." Later in the hearing defense counsel stated: "I went through every issue from April 1 until the day before yesterday. There were a number of other quotes of the District Attorney in the newspaper. *However, they're rather innocuous such as how many peremptory challenges have been used.* I don't think that redounds any harm. Also he [the district attorney] says—you can't really tell whether that's a direct quote in an interview or what he said in the courtroom, but these that I've submitted, are in my opinion direct violation of the gag order." (Italics added.)

The court had earlier regularly admonished the jury "not to read any newspapers or listen to the radio broadcast, or anything on TV that is in

any way connected with this case," at one point adding, "But I may be asking you from time to time if you have been reading the paper. I will check." As a general matter it must be presumed that the jurors observed and applied the instructions given them. (See, e.g., *People v. Chavez* (1958) 50 Cal.2d 778, 790 [329 P.2d 907]; *People v. Sutic* (1953) 41 Cal.2d 483, 494 [261 P.2d 241].)

In the context of a claim of juror misconduct we have held that the court must conduct "an inquiry sufficient to determine the facts . . . whenever the court is put on notice that good cause to discharge a juror may exist." (*People v. Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251]; see also *People v. Andrews* (1983) 149 Cal.App.3d 358, 366 [196 Cal.Rptr. 796, 46 A.L.R.4th 1].) In those cases placing ultimate responsibility upon the *court* to make such inquiry, the trial court had been alerted to facts suggestive of potential misconduct, and hence had proceeded to voir dire the jurors or other relevant witnesses to determine the extent, if any, of prejudice. (See, e.g., *People v. Knights* (1985) 166 Cal.App.3d 46, 51 [212 Cal.Rptr. 307] [report by foreman that two jurors had outside discussions regarding case]; *People v. McNeal* (1979) 90 Cal.App.3d 830 [153 Cal.Rptr. 706] [report by jury foreman that another juror had personal knowledge of case]; *People v. Thomas* (1975) 47 Cal.App.3d 178, 180 [120 Cal.Rptr. 637] [fact that four jurors had read prejudicial newspaper article brought to trial court's attention].)

 In the present case the court was not furnished with affirmative evidence of any sort—indeed the allegation was never even made—that any of the jurors *had actually read* the newspaper articles in question. Nevertheless, "the essence of judicial discretion in dealing with [matters of juror misconduct] is to so manage matters as to control the danger of jury prejudice to the extent practicable." (*People v. Thomas, supra*, 47 Cal.App.3d at p. 181.) Although we agree with the Attorney General that "the trial court cannot be required to act on mere rumor or innuendo" nor investigate the potential merits of every mistrial motion for defense counsel, we nevertheless believe the better and proper course of action here would have been for the court "to make whatever inquiry is reasonably necessary" to determine if there was in fact any misconduct, and if such be found, whether "the [offending] juror should be discharged and whether the impartiality of the other jurors has been affected." (*Burgener, supra*, 41 Cal.3d at p. 518, quoting from *People v. McNeal, supra*, 90 Cal.App.3d at p. 839.) "Failure to conduct a hearing sufficient to determine whether good cause to discharge the juror exists is an abuse of discretion subject to appellate review. [Citations.]" (*Burgener, supra*, at p. 520.)

 However here, as in *Burgener* (wherein the trial court, alerted to the possibility that one juror may have been intoxicated during delibera-

tions, and with defense counsel's consent, admonished the jury as a group but refrained from conducting any further inquiry), the record on appeal is insufficient to evaluate a claim of juror misconduct. (*Burgener, supra*, 41 Cal.3d at p. 522.) Even assuming arguendo one or more jurors read the articles, defense counsel's own characterization of certain excerpts as "rather innocuous" would hardly sustain a finding of prejudice. The claim must therefore be rejected on appeal. (*Burgener, supra*, 41 Cal.3d at p. 522; *People v. Pope, supra*, 23 Cal.3d at pp. 426, 428.)

7. *Evidence of the Prior Conviction of Shooting at an Inhabited Dwelling*

 Defendant contends that evidence of his prior felony conviction on a plea of nolo contendere to unlawfully discharging a firearm at an inhabited dwelling (§ 246) should have been excluded from evidence at the penalty phase, because such a plea is not expressly denoted in section 190.3, factor (c), authorizing admission of evidence of "[t]he presence or absence of any prior felony conviction."

The contention is meritless. Section 1016, which defines the six kinds of pleas in criminal cases, provides in pertinent part: "3. Nolo contendere. . . . The court shall ascertain whether the defendant completely understands that a plea of nolo contendere *shall be considered the same as a plea of guilty* and that, upon a plea of nolo contendere, the court shall find the defendant guilty. *The legal effect of such a plea, to a crime punishable as a felony shall be the same as that of a plea of guilty for all purposes.*" (Italics added.)

Moreover, it has been correctly observed that the Legislature, in adding subdivision 3 to section 1016 to allow a plea of nolo contendere in criminal actions, "did not provide for . . . exclusion of the collateral use of a conviction based on a plea of nolo contendere in criminal actions. The full use of the criminal conviction based on a plea of nolo contendere in later criminal actions was neither prohibited by the Legislature nor is it constitutionally compelled." (*People v. Chagolla* (1984) 151 Cal.App.3d 1045, 1049 [199 Cal.Rptr. 181].)

8. *Instruction on Elements of Prior Felony Conviction Under Section 190.3, Factor (c)*

By stipulation, documentary evidence that defendant had been convicted of shooting at an inhabited dwelling (§ 246), a felony, was introduced as an aggravating circumstance (§ 190.3, factor (c).) At the prosecutor's request, and without objection from defense counsel, the jury was instructed with

CALJIC No. 9.03.1 defining the elements of the offense, which states in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house is guilty of a crime. . . . [¶] In order to prove the commission of this crime, each of the following elements must be proved: . . . [t]hat a firearm was discharged *by the person* at an inhabited dwelling house and . . . [t]hat such act was done maliciously and willfully." (Italics added.)

At the *in limine* conference held outside of the jury's presence, the parties agreed that although defendant had *personally* discharged a firearm at the dwelling in question *three weeks prior to the incident which formed the basis of the section 246 conviction,* he was *not* the actual shooter in the incident which underlay the prior conviction. According to the representations of the prosecutor at the in chambers conference, defendant had initially been charged with the earlier incident in which he had personally discharged a weapon at the dwelling, but those charges were thereafter dismissed as part of the plea bargain wherein he pled nolo contendere to the violation of section 246 stemming from the second shooting incident. In the second incident defendant was driving the vehicle from which an accomplice had fired the shots. On such facts he shared accomplice liability for the crime.

Outside the jury's presence, the prosecutor argued that both the uncharged and charged prior shooting incidents "are all wrapped up together in one and all go to show the character of the defendant and the circumstances surrounding the entry of the plea to the 246." Defense counsel, although conceding (and having stipulated) that the prior *conviction* was admissible under section 190.3, factor (c), argued that the incident giving rise to the conviction did not reflect violent criminal conduct within the meaning of factor (b). The court ultimately ruled that evidence of the details of the underlying offense would be excluded.

Under the stipulation by which evidence of the prior conviction was admitted, and the instructions given, the jury could but draw only one inference; that defendant had suffered the conviction for *personally* shooting at an inhabited dwelling. As will be shown, the prosecutor compounded the error and committed misconduct in his closing argument by urging the jury to draw just such an inference. (*Post,* at p. 260.)

As we explained in *People* v. *Phillips, supra,* 41 Cal.3d 29, a trial court has no sua sponte duty to instruct the jury as to the elements of all of the other crimes that have been introduced at the penalty phase, although the cases do not prohibit a trial court from instructing on the elements of other crimes offered as aggravating factors in an appropriate case where either the defendant or the prosecution requests such instruction. (*Id.,* at

pp. 72-73, fn. 25; see *People* v. *Davenport* (1985) 41 Cal.3d 247, 281-282 [221 Cal.Rptr. 794, 710 P.2d 861].)

In the present case, the prosecution requested instruction on the elements of an offense for which evidence of defendant's prior conviction was being admitted under section 190.3, factor (c). As with the rule of *Phillips* pertaining to such instruction on prior violent criminal activity offered under factor (b), in an appropriate case, instruction on the elements of a prior felony *conviction* admitted under *factor (c)* may be no less vital to a capital penalty phase jury's proper consideration of such evidence than similar instruction on other violent criminal activity. ■■■ We here reaffirm that where evidence of a prior felony conviction is admitted as an aggravating circumstance under section 190.3, factor (c), the prosecution or defense is entitled, upon request, to an instruction informing the jury of the elements of the offense underlying the prior conviction.

However, where such a requested instruction is to be given, and where— as here—the parties are apprised of facts concerning defendant's role in, or commission of, the prior offense, which are inconsistent with standard instruction on the elements of such offense, an appropriate clarifying instruction should be sought, or stipulation obtained, to accurately characterize the nature of the aggravating prior felony conviction being placed before the jury.

■■■ Here, the giving of standard CALJIC No. 9.03.1 was misleading because, although that instruction conveyed the elements of the offense of shooting at an inhabited dwelling, it failed to distinguish defendant's arguably less culpable role as an aider-abettor ("wheel man") in the incident. We conclude, however, that the instructional error was harmless, largely in consideration of two factors.

First, at the penalty phase the jury properly could consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding . . ." (§ 190.3, factor (a).) Here the jury had already found that defendant *personally* used a firearm in the commission of this "willful, deliberate, and premeditated" murder. The impact of a misconstrued inference that defendant had previously been convicted of *personally* discharging a firearm at an inhabited dwelling pales in comparison.

Second, even assuming that defense counsel had objected to the standard instruction on the elements of a violation of section 246, or otherwise affirmatively brought before the jury evidence that defendant had not in fact personally discharged a firearm at an inhabited dwelling, at the very least the jury still would have properly been informed that defendant, as a convicted accomplice, shared the actual shooter's criminal intent and purpose in discharging a firearm at the dwelling in the prior incident.

In light of these factors, and considering the totality of the evidence presented in the penalty phase, we are satisfied there is no reasonable possibility that the jury would have rendered a different penalty verdict even had further clarifying instructions on the section 246 prior been given. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) It follows that counsel's failure to request such further instructions did not constitute prejudicial ineffective assistance of counsel.

### 9. *Prosecutorial Misconduct—Penalty Phase*

Defendant asserts that the prosecutor committed numerous instances of misconduct at the penalty phase. He further argues that, in those instances where defense counsel failed to raise an objection, such omission constituted ineffective assistance of counsel. Lastly, he argues that in each instance the trial court had a duty to intervene on its own motion to curb the misconduct.

As will be shown, none of these claims warrants reversal of the penalty verdict.

### a) *The Claims of Misconduct*

The prosecutor argued that defendant had murdered the victim "on the bet that he might have a few dollars in his pocket," and went on to state, "he'll do it again. Because, life means nothing to him." Defense counsel's objection on grounds that the argument was "totally improper" was sustained, and the jury admonished to disregard it. Immediately thereafter, the prosecutor conditioned his comments by explaining: "Ladies and gentlemen, *the evidence shows* clearly that the only reason that Keith Adcox murdered David Lee Orozco was on a guess that he had a few dollars in his pocket. . . . ", and went on to suggest that such evidenced a "lack of concern or value for human life." (Italics added.)

Relying on *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], defendant assails these comments as an improper reference to future dangerousness. His reliance is misplaced. "We recently held that a prosecutor's comments on a defendant's future dangerousness are 'within the proper bounds of argument to the jury.' (*People* v. *Davenport* [, *supra*,] 41 Cal.3d 247, 288.) In reaching this conclusion, we distinguished *People* v. *Murtishaw* [, *supra*,] 29 Cal.3d 733, 767-768, where expert opinion regarding projections of future violence was held to be inadmissible. In *Murtishaw*, our primary concern was that expert opinion on the subject of defendant's propensity to commit violence is unreliable and frequently erroneous and often carries great weight with the jury. (*Id.* at pp. 767-768.) We do not believe a prosecutor's comments during closing argu-

ments present the same potential for prejudice." (*People* v. *Miranda, supra*, 44 Cal.3d at p. 111.)

As was the case in *Miranda,* here too the comments did not deprive defendant of a fair trial on the issue of penalty. (44 Cal.3d at p. 111; *Darden* v. *Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157, 106 S.Ct. 2464, 2472].)

█ Of the five remaining allegations of prosecutorial misconduct, none was objected to below, nor were any curative admonitions sought. Because defendant failed to object to any of the challenged arguments or comments at trial, he is precluded from now raising the objections on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.)

Defendant seeks to overcome the waiver rule by asserting that counsel's failure to object to the prosecutor's misconduct in each instance deprived him of the effective assistance of counsel. (See *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.) In light of this further claim we shall briefly discuss the merits of each assignment of misconduct:

1) *Reference to Defendant's Courtroom Demeanor*

█ At one point during his argument, the prosecutor directed the jury's attention toward defendant and stated, "What do you see when you look over there? . . . You see coldness. You see the same coldness with which he carried out the execution of David Lee Orozco; the same coldness with which he bragged to Annette Tillery about the murder . . . to look big in her eyes."

Defendant contends that the prosecutor's argument constituted improper comment on lack of remorse. We disagree; the comments can be viewed as properly bearing on the absence of remorse as a mitigating factor. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 112; *People* v. *Ghent, supra,* 43 Cal.3d at p. 771; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248] [prosecutor validly argued: "There he sits. A murderer. A robber-murderer. . . ."]; *People* v. *Talbot* (1966) 64 Cal.2d 691, 712 [51 Cal.Rptr. 417, 414 P.2d 633] [comment on defendant's failure to call witnesses who had observed how he "appeared and acted" was proper as bearing on lack of remorse].)

2) *Expressions of Personal Belief*

█ As with his arguments regarding prosecutorial misconduct at the guilt phase (*ante,* p. 236), defendant asserts that the prosecutor's comments on future dangerousness and courtroom demeanor were improper expressions of his own personal belief.

"We have held that it is improper for the prosecutor to state his personal belief regarding either defendant's guilt or the appropriateness of the death penalty, *based on facts not in evidence. (People* v. *Bandhauer* (1967) 66 Cal.2d 524, 529 [58 Cal.Rptr. 332, 426 P.2d 900].)" (*People* v. *Ghent, supra,* 43 Cal.3d at p. 772, italics in original.) Our scrutiny of the prosecutor's penalty phase arguments discloses no such misconduct. In each instance complained of, his arguments to the jury demonstrate that he was "merely presenting his views of deductions and inferences warranted by the evidence." (*People* v. *Pineiro, supra,* 129 Cal.App.3d at p. 924.)

### 3) *Compassion*

■ Defendant contends the prosecutor misstated the law by imploring the jury not to exercise compassion.

The prosecutor argued to the jury: "I ask you that while you consider the evidence, while you deliberate . . . that you don't yield to the most obvious trait of human nature, that's compassion. [¶] I'm not saying that you can't use that, that there isn't a place for that because there is, but don't yield to that temptation just to shuck it all and compromise and just say let's take the easy way out and not make a decision based on the evidence." The prosecutor then urged the jury that although it was natural and proper to feel compassion for defendant's mother, they should not let compassion for her "overrule [their] judgment as to what should be done with [defendant]."

These comments were not misconduct. As in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1201 [240 Cal.Rptr. 666, 743 P.2d 301], the prosecutor "did not say that the jury could not consider any mercy or sympathy factors which were supported by the evidence." (Compare *People* v. *Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279].) Rather, he simply urged the jury not to decide defendant's fate based on untethered compassion for him or his mother alone, without following their lawful obligation to consider the evidence.

### 4) *Impact of Crime on Victim's Family*

The prosecutor argued to the jury that in murdering the victim, defendant showed "no concern for human life or for Kathy Orozco or David Lee Orozco's sons when he committed that act." Pointing out that he could not have known whether the victim even had a family at the time of the shooting, defendant argues that such was an improper reference to the impact of the crime on the victim's family and thus prejudicial misconduct.

■ The comment was arguably inappropriate under the recent decision in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] barring admission of victims' impact statements at the penalty phase

of capital cases. Although *Booth* is factually distinguishable, we nevertheless conclude beyond a reasonable doubt, as we did in *People* v. *Ghent, supra,* 43 Cal.3d at pages 771-772, that the very brief comment here had no effect on the penalty verdict. "Unlike *Booth,* where the jury was given lengthy and specific details regarding the *actual impact* on the victim's family, here the prejudicial effect of the prosecutor's comments was undoubtedly minimal or nonexistent." (*Ghent, supra,* at p. 772, italics in original.)

### 5) *Misstatement Regarding Facts of Prior Felony Conviction*

By stipulation, as already noted (*ante,* p. 248), documentary evidence that defendant had been convicted of shooting at an inhabited dwelling, a felony (§ 246), was introduced as an aggravating circumstance (§ 190.3, factor (c).) Moreover, the jury was instructed in the language of CALJIC No. 9.03.1 that: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house is guilty of a crime. . . . [¶] In order to prove the commission of this crime, each of the following elements must be proved: . . . [t]hat a firearm was discharged *by the person* at an inhabited dwelling house and . . . [t]hat such act was done maliciously and willfully." (Italics added.)

The record clearly reflects that the prosecutor was aware defendant was *not* the actual shooter in the incident underlying the prior conviction, and that defendant was on that occasion driving the vehicle from which an accomplice had fired the shots. Nevertheless, in his argument to the jury, the prosecutor described the prior conviction thusly: "violation of 246 of the Penal Code, in that the defendant used a gun, that he fired it at an inhabited dwelling house, and he did it willfully, and he did it maliciously."

We have already determined that on these facts, the standard instruction given the jury respecting the elements of a violation of section 246 was inadequate and misleading. (*Ante,* p. 256.) ▮ It is true that the prosecutor's comments accurately paraphrased the language of the instruction, but, given that he knew defendant had not been the actual shooter, his statement to the jury that "the defendant used a gun . . . he fired it . . ." was misleading, and hence misconduct.[10]

---

[10] The parties' representation in the record that defendant had in fact personally discharged a firearm at the same dwelling several weeks prior to the incident underlying his conviction does not alter our finding of misconduct. Although evidence of such conduct may well have been admissible as other violent criminal activity under section 190.3, factor (b) (see *Phillips, supra,* 41 Cal.3d at p. 72), the court in this case did not have the benefit of a reading of *Phillips,* and ruled such evidence inadmissible under factor (b). That this ruling may have been in error is unavailing to the People now, no *evidence* of the earlier shooting incident ever having been introduced.

Once again, however, defense counsel having failed to object to the prosecutor's remarks or seek an appropriate admonition which could have readily cured the error, this claim of prosecutorial misconduct too is waived on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.)

### b) *Counsel's Incompetence*

We have concluded that the prosecutor's references to defendant's courtroom demeanor and to the role of compassion in penalty phase deliberations were not misconduct. Nor did the prosecutor improperly inject his personal beliefs into the proceedings. The prosecutor did, however, commit misconduct in arguing to the jury that defendant had previously been convicted of *personally* shooting at an inhabited dwelling.

Defense counsel failed to object to, or request a curative admonition regarding, the misconduct. ■ "Although defendant now asserts that such omissions disclosed incompetence on trial counsel's part, we previously have indicated that a mere failure to object to evidence or argument seldom establishes counsel's incompetence. (*People* v. *Jackson* [(1980)] 28 Cal.3d 264, 292 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].)" (*People* v. *Ghent, supra,* 43 Cal.3d at p. 772.)

■ For the same reasons which have led us to conclude that the instructional error on the elements of the prior conviction of shooting at an inhabited dwelling was harmless (*ante,* p. 256), it follows that counsel's failure to object to the prosecutor's improper comments on the same subject matter was similarly nonprejudicial under the "reasonable probability" standard of review for claims of ineffective assistance of counsel at the penalty phase. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 698 [80 L.Ed.2d 674, 770, 104 S.Ct. 2052].)

### c) *Trial Court's Duty to Intervene*

■ Defendant argues that, regardless of whether counsel raised objections to the claimed instances of prosecutorial misconduct, the trial court had a sua sponte duty to intervene and seek to curb the misconduct. We do not agree. In rejecting such a claim, we observed in *People* v. *Poggi* (1988) 45 Cal.3d 306, at pages 335-336 [246 Cal.Rptr. 886, 753 P.2d 1082]: "The authority upon which [defendant] relies for the court's duty to intervene sua sponte, *People* v. *Perez* (1962) 58 Cal.2d 229, 250 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], is no longer valid in light of our rejection of its legal underpinnings (i.e., the 'close case' exception) in *People* v. *Green, supra,* 27 Cal.3d at pages 27-34." And in any event, the two instances of misconduct we have found in this case do not compare in seriousness or prejudicial impact to the gross misconduct committed in *Perez*.

### 10. *Defense Counsel's Potential Conflict of Interest*

Defendant's trial counsel was formerly a deputy district attorney in Stanislaus County. In 1980, defendant pled guilty to receiving stolen property (§ 496) in that county, which prior conviction was one of the three prior felony convictions introduced in the instant case as a circumstance in aggravation (§ 190.3, factor (c)). In preparation for the penalty phase, defense counsel went to Stanislaus County to peruse the official records of defendant's priors in search of grounds to argue their inadmissibility. In doing so, he found that the district attorney present in court when defendant entered his guilty plea to receiving stolen property in 1980 had mentioned his (defense counsel's) name. Defense counsel's further research revealed that, while a deputy district attorney, he had negotiated the plea bargain with defendant under which a charge of burglary was ultimately dismissed in exchange for defendant's guilty plea to receiving stolen property.

Counsel promptly brought the matter to the court's attention. In defendant's presence, he explained all of the circumstances which led to his inadvertent discovery of his involvement in the prior proceeding. He believed there was no conflict of interest but explained that "in good conscience" he felt obligated to bring the matter to the court's attention. He stated that he had fully discussed the matter with defendant.

Defendant acknowledged that counsel had disclosed and discussed the matter with him. When asked if there was any question in his mind about counsel's continued representation of him at the penalty phase, defendant replied negatively. Defendant stated he had no objection to counsel's continued representation of him; affirmatively stated he wished to proceed notwithstanding the disclosure; answered affirmatively when asked if he wished to "waive any possible defect that may have occurred"; and twice affirmed there was no doubt in his mind that he wanted to proceed represented by Mr. Giudice. In response to the court's inquiry: "Do you wish to have outside counsel advise you in this matter?", defendant replied, "No, sir."

It is true that at one point, upon being asked if he wished to waive and give up his right to outside counsel's advice on the matter, defendant replied negatively. The record on the whole, however, convinces us that defendant's answer to that one question was misconstrued.[11] The discussion of the matter concluded with the following colloquy:

---

[11] Defendant was familiar with the procedure of obtaining advice from "outside counsel." Prior to the start of trial, Mr. Giudice had substituted in as defendant's attorney when defendant's first attorney withdrew as a result of a State Bar disciplinary matter then pending against him. On that occasion defendant had accepted the court's offer of consultation with independent outside counsel to advise him on the matter.

"THE COURT: Well, I will ask you once again, Mr. Adcox, do you want separate counsel for the penalty trial?

"THE DEFENDANT: No, sir.

"THE COURT: When I say separate counsel, counsel other than Mr. Giudice.

"THE DEFENDANT: No, sir.

"THE COURT: Do you want separate counsel?

"THE DEFENDANT: No, sir.

"THE COURT: Do you waive and give up that right?

"THE DEFENDANT: Yes, sir.

"THE COURT: Do you have any qualms, doubts, or any reservations whatsoever about proceeding on this basis of having Mr. Giudice represent you?

"THE DEFENDANT: No, sir."

 Defendant argues that these circumstances establish a conflict of interest between him and trial counsel, and that the court erred in failing to obtain a knowing and intelligent waiver of said conflict.

We disagree. "When a trial court undertakes to appoint counsel for indigent codefendants (see *People* v. *Chacon* [(1968)] 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454]), it must assume the burden of assuring that its appointment does not result in a denial of effective counsel because of some possible conflict. [Citations.]" (*People* v. *Cook* (1975) 13 Cal.3d 663, 671 [119 Cal.Rptr. 500 [532 P.2d 148], cert. den. (1975) 423 U.S. 870 [46 L.Ed.2d 100, 96 S.Ct. 135]; *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 612 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].) Where the evidence conflicts "concerning the nature and extent of the past and present attorney-client relationship, the trial court's findings based upon such conflicting evidence are conclusive on appeal. [Citations.]" (*Yorn* v. *Superior Court* (1979) 90 Cal.App.3d 669, 674 [153 Cal.Rptr. 295].)

 We find no factual basis in this record to establish either an actual or potential conflict of interest. Attorney Giudice, an officer of the court, " ' "[was] in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." [Citation.]' " (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 112 [197 Cal.Rptr. 52, 672 P.2d 835]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 776 [248 Cal.Rptr.

126, 755 P.2d 310].) Counsel promptly and conscientiously disclosed the facts of his involvement in defendant's prior conviction proceedings. On matters respecting the priors, he successfully managed to obtain an order excluding any evidence of violent conduct underlying defendant's prior convictions, notwithstanding the prosecution's efforts to introduce such as evidence in aggravation under section 190.3, factor (b). (*Ante*, p. 255.)[12] Defendant fails to explain how counsel's familiarity with all the circumstances of the prior conviction proceeding *in fact* worked to his disadvantage and prejudice.

We therefore reject defendant's claim that a prejudicial conflict of interest has been shown. Having so concluded, his related claim that counsel was ineffective in failing to insist that defendant receive the advice of independent counsel on the matter must likewise fail. Moreover, even were we to assume that a conflict of interest was established, on this record we are satisfied that defendant effectuated a knowing, informed and voluntary waiver of his right to conflict-free representation. (See *People* v. *Mroczko, supra*, 35 Cal.3d at p. 110.)

11. *Instructions on Sympathy and General Character/Background Evidence*

■■■ Defendant argues that the jury was misinstructed on the proper role of sympathy and general character/background evidence in the penalty phase. In reviewing such claim, we examine the instructions and arguments as a whole to determine whether the jury was adequately informed of the proper scope of mitigating evidence. (*California* v. *Brown, supra*, 479 U.S. 538, 546 [93 L.Ed.2d 934, 943] (conc. opn. of O'Connor, J.); see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-115 [71 L.Ed.2d 1, 10-11, 102 S.Ct. 869]; *Ghent, supra*, 43 Cal.3d at p. 777; *People* v. *Brown, supra*, 40 Cal.3d at pp. 536-537, 544, fn. 17; *People* v. *Easley* (1983) 34 Cal.3d 858, 878, & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

We have undertaken such a review, and conclude that the jury was not misled regarding its responsibility to consider all of the mitigating evidence in the case.

First, the jury was *not* instructed at the penalty phase with the "no-sympathy" language embodied in CALJIC No. 1.00. (Compare *People* v. *Brown, supra*, 40 Cal.3d at pp. 536-537, vacated *sub nom. California* v. *Brown, supra*, 479 U.S. 538 [wherein the high court held that the giving of

---

[12] We recognize that counsel's competency was called into question when he failed to object to the instructions on the elements of the prior conviction of shooting at an inhabited dwelling, notwithstanding their potential for misleading the jury as to the underlying facts of defendant's commission of that offense. (*Ante*, pp. 254-256.) That matter, however, is unrelated to the alleged conflict of interest here, and defendant does not claim otherwise.

the California standard antisympathy instruction (CALJIC No. 1.00) at the penalty phase is not unconstitutional per se].)

Next, defendant argues that the giving of CALJIC No. 1.00 at the guilt phase—with its standard no-sympathy admonition—may have had a prejudicial carryover effect at the penalty phase. We have rejected this identical argument in previous cases. (See *People* v. *Gates, supra,* 43 Cal.3d at p. 1209; *People* v. *Miranda, supra,* 44 Cal.3d at p. 102.) There is no indication in this record that the jury was misled into applying the antisympathy guilt phase instruction at the penalty phase. (*Miranda, supra,* at p. 102; cf. *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 784-786.)

Nor was there *Easley* error in this case. In *Easley, supra,* 34 Cal.3d 858, we found section 190.3, factor (k) (reproduced in former CALJIC No. 8.84.1) constitutionally infirm in that it spoke only of a "circumstance which extenuates the gravity of the crime." We therefore imposed the prospective requirement that "trial courts—in instructing on the factor embodied in section 190.3, [factor] (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (*Id.,* at p. 878, fn. 10.)

Here the trial court modified the factor (k) language in former CALJIC No. 8.84.1 to read: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, *including but not limited to the defendant's character, background, history, mental condition, and physical condition.*" (Italics added.) The instruction, as modified, adequately addressed our concerns set forth in *Easley.* Moreover, in response to the jury's question during penalty phase deliberations asking for further definitions of the terms "aggravating" and "mitigating," the court informed the jury that mitigation includes "circumstances that do not amount to a justification or excuse of the offense or act in question, but may properly be considered in mitigation or reduction of the punishment"[13]

Lastly, we have scrutinized the prosecutor's penalty phase arguments and find nothing therein which nullified the effect of the proper instructions. The prosecutor argued there was a proper place for "compassion" in the penalty deliberations. He reread the modified catchall factor (k) instruction and suggested to the jury "[i]t is a pretty broad section. . . ." And he discussed the testimony of the defense witnesses who sought to present mitigating evidence of defendant's general character and background.

---

[13] The correctness of the court's responses to the jury's inquiry is addressed separately below. (*Post,* pp. 269-270.)

12. *Sentencing Discretion*

 Defendant contends that the mandatory sentencing formula of section 190.3 is unconstitutional on the ground that it withdraws constitutionally compelled sentencing discretion from the jury. "In *People* v. *Brown* [, *supra,* ] 40 Cal.3d 512, 538-544, vacated on other grounds *sub nom. California* v. *Brown* [, *supra,* ] 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], however, we rejected that very contention. Defendant presents us with no compelling reason to reconsider our holding." (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 650 [244 Cal.Rptr. 181, 749 P.2d 836].)

Although we found the statutory scheme of section 190.3 constitutional in *Brown,* "We acknowledge[d] that the language of the statute, and in particular the words 'shall impose a sentence of death,' leave room for some confusion as to the jury's role." (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Our concern in *Brown* was that former CALJIC No. 8.84.2, which was drawn verbatim from the statutory language, might mislead the jury in two interrelated ways in fully comprehending its sentencing discretion and responsibility: "First, we pointed out that the jury might be confused about the nature of the weighing process. As we observed: '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of an imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider.' [Citation.]

"Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances' (italics added), could mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion. Instead we stated: 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" the mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the "weighing" process, *he decides that death is the appropriate penalty under all the circumstances.* Thus the

*jury, by weighing the various factors,* simply *determines under the relevant evidence which penalty is appropriate in the particular case.'"* (*People* v. *Allen, supra,* 42 Cal.3d at pp. 1276-1277, italics in original.)

Our review of counsel's arguments in this case reveals nothing which would have confused the jury regarding the proper nature of the weighing process, our first concern in *Brown*. The prosecutor in no way suggested that the weighing process was a mere "mechanical" or "counting" process. He argued what he believed to be the state of the evidence under each of the factors (a) through (k) where applicable, and said of the catchall factor (k), "[i]t is a pretty broad section. . . ."

At one point in his closing argument, defense counsel suggested the jury envision a chart with two "columns," one for aggravation and one for mitigation. However, he too never suggested that the weighing process was a mechanical "counting up" of the factors. Rather, he urged the jurors to recall the trial judge's repeated admonishment during voir dire, emphasizing: "you don't just say one, two, three death or one (a) or two (a) and two (b), life without possibility of parole. His [the trial judge's] words were the law doesn't work that way and it doesn't work that way. [¶] You determine under all the circumstances what the penalty shall be. Nobody, including his Honor, the law, Mr. DuTemple [the district attorney], or myself or the defendant can tell you."

We conclude that the jury was not misled into thinking that it must impose death if the aggravating circumstances *numerically outnumbered* the mitigating ones.

Turning to our second concern in *Brown*, whether the jury understood the full scope of its sentencing discretion as to the ultimate question it was being called upon to answer—which sentence to impose—our examination of the instructions and arguments as a whole convinces us that the jury was not misled as to its obligation to determine whether or not death was the *appropriate* penalty in this case.

We acknowledge that on three occasions in his closing argument "the prosecutor focused on the mandatory phrasing of the statutory instruction, that the jury 'shall' impose death if the aggravating circumstances outweigh the mitigating ones" (*People* v. *Hendricks, supra,* 44 Cal.3d at p. 653), at one point adding, "you haven't any choice."[14]

---

[14] In transcribing two such passages the court reporter typed the word "shall" in upper case letters, presumably reflecting the prosecutor's emphasis of that word.

The prosecutor also told the jury: "Now, I realize that this is again probably one of the more difficult things that you've done, but do not—I ask you, do not fall into the trap, if you will, or the misconception that you twelve jurors are going to be tossed into that room floating around and unfettered as I'm sure you'll hear the word, to make up your mind, your deci-

 As we stated in *Allen* and *Hendricks*, however, it is not improper per se to instruct the jury that it "shall" impose death. (*People* v. *Allen, supra*, 42 Cal.3d at p. 1279, and fn. 38 [prosecutor argued, "Shall, not may, not might, not maybe. It is very explicit. If the aggravating evidence outweighs the mitigating evidence you shall return a verdict of death"]; *People* v. *Hendricks, supra*, 44 Cal.3d at p. 653 [prosecutor emphasized mandatory "shall" language and described the process as an "automatic" one]; see also *People* v. *Grant* (1988) 45 Cal.3d 829, 857 [248 Cal.Rptr. 444, 755 P.2d 894] [prosecutor suggested that if the aggravating factors predominated, the law "requires" imposition of the death penalty].)

 Although the prosecutor here urged the jurors to follow the mandatory language of the law, he also explained that they were to base their penalty decision on a weighing of the applicable factors, inherent in which was the determination of appropriateness of penalty. In his opening remarks he told the jurors that their participation in this trial was "probably one of the most difficult things you have ever done." At one point he argued: "[I]f you consider the facts and you have considered those as being—as the oath you took as jurors, the factors you are to consider in aggravation or mitigation, now if you find the evidence supports mitigation, well and good." And toward the conclusion of his argument he stated: "If there is [*sic*] any of you or all of you who, as you sit there right now, honestly do not, in good conscience, feel you can invoke the death penalty regardless of what you have said in the past, that is fine. Now is no time to enter into an abstract discussion about the death penalty, because we are not dealing with it in the abstract sense. We are dealing with it in reality."

Any ambiguity remaining in the jurors' minds regarding the scope of their sentencing discretion and responsibility was surely cured by defense counsel's closing argument. He explained to the jurors they were "free to determine what your conscience says with the guidelines given to you to be used as you determine them . . . You determine it basically on what evidence you have heard, what evidence you evaluate, *your good moral conscience guided by the law, but you solely determine it, nobody else*." (Italics added.) He cautioned the jurors, "[W]e don't just sit here and say, 'Okay. We've reached the verdict of murder, now we say death'?", and immediately followed with the comments, previously noted, which explained that their role was not to simply add up factors (a) through (k) in numerical fashion in determining the appropriate penalty. Counsel argued, "[J]ustice is supposed to be represented by even-handed weighing the scales, even-

sion as to what verdict it should be. That's not the case. That is not the law. It's not that each and every one of you individually are going to have on your conscience, your sole decision as to the verdict without regard to any guidelines, without regard to what the law of the State of California is. Because there are guidelines and you took an oath, each and every one of you as jurors, that you would follow the law and that is what I ask you to do."

handed weighing the scales. *What is morally right in the particular circumstances.*" (Italics added.) He told the jury, "You can't be blind, you know what the facts are. You have to say what's morally right in this case and that's a factor for you to consider. . . . [¶] *It has to be each one individual opinion and all twelve opinions have to be the same.*" (Italics added.) He urged that "justice" had to be considered in the mitigating "column": "What is fair? What is morally right in this case? That can't just be brushed under the carpet. That has got to be considered."

Finally, counsel told the jury: "Ladies and gentlemen, what I'm asking you to do is the same as the District Attorney is, to use your good common sense, *to use your moral sense of justice of what is right in this case.*" (Italics added.) He concluded by stating: "*[I]t comes down to your good conscience.* . . . and it comes down to the guidelines that his Honor has given you and will give you. . . ." (Italics added.)

Viewing the instructions and arguments as a whole, we conclude the jurors were not misled as to their sentencing discretion, and realized that the ultimate sentencing responsibility rested with them, and them alone. (*People* v. *Hendricks, supra,* 44 Cal.3d at p. 655.)

13. *Special Instructions Defining "Aggravating" and "Mitigating"*

Shortly after commencing their deliberations, the jury requested the court to define "aggravating" and "mitigating." In discussing the matter with the court, both the prosecutor and defense counsel stated they knew of no pertinent cases specifically defining those terms. The court, with both counsel and defendant personally in agreement, ultimately responded by giving the jury the definitions of "aggravation" and "mitigation" found in Corpus Juris Secundum, as follows: "Aggravation. Any circumstance attending the commission of a crime . . . which increases its guilt or enormity or adds to its injurious consequences, . . . but which is above and beyond the essential constituents of the crime or tort itself" (3 C.J.S., at p. 507); "*Mitigating circumstances.* Such circumstances as do not amount to a justification or excuse of the offense or act in question but may properly be considered in mitigation, or reduction, of the punishment . . . ." (14 C.J.S., at p. 1123.)

We recently found no prejudice from the reading of nearly identical definitions in *People* v. *Dyer, supra,* 45 Cal.3d at pages 77-78. Indeed, we concluded that such definitions "provided a helpful framework within which the jury could consider the specific circumstances in aggravation and mitigation set forth in section 190.3." (*Ibid.*) As in *Dyer,* here the jury was also instructed that, "you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed." (Former CALJIC No. 8.84.2.) Accord-

ingly, we find no error or prejudice in the presentation of both definitions to the jury. We therefore reject defendant's further claim that defense counsel was somehow ineffective in failing to further research the matter.

### 14. *Deletion of Nonapplicable Statutory Factors*

■■■ Defendant contends that the trial court erred in failing to delete the nonapplicable or irrelevant statutory aggravating and mitigating factors. (§ 190.3.) We have previously rejected this argument. (See *People* v. *Miranda, supra*, 44 Cal.3d at pp. 104-105; *People* v. *Ghent, supra*, 43 Cal.3d at pp. 776-777 [1977 death penalty law].) "[A]s is apparent from the statutory language, it is for the jury to determine which of the listed factors are applicable or 'relevant' to the particular case. (§ 190.3, par. 6.)" (*Miranda, supra*, 44 Cal.3d at p. 105.)

### 15. *Extreme Duress or Substantial Domination*

Section 190.3, factor (g), sets forth as a mitigating circumstance: "Whether or not defendant acted under *extreme* duress or under the *substantial* domination of another person." (Italics added.) ■■■ Defendant contends that, under the instruction in the statutory language of factor (g), the jury was precluded from considering lesser degrees of duress or domination of another person.

We have concluded, however, in an analogous context, "that [factor] (k), by allowing consideration of *all* 'extenuating' circumstances, permits the jury to decide that less pronounced forms of mental or emotional disturbance mitigate the seriousness of the capital offense [under factor (d), which states, 'Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance']. (*Ghent, supra*, 43 Cal.3d at p. 776.)" (*People* v. *Keenan* (1988) 46 Cal.3d 478, 519 [250 Cal.Rptr. 550, 758 P.2d 1081].)

We hold that the reasoning of *Ghent* and *Keenan* applies with equal force to defendant's identical argument here *under factor* (g). There is no basis in the record to conclude that the jury failed to give proper mitigating weight to any evidence, under defendant's theory, that he acted under duress or the domination of his accomplices Annette Tillery and Howard Love.

### 16. *Age as an Aggravating Factor*

One of the factors to be considered by the penalty jury "if relevant" is "[t]he age of the defendant at the time of the crime." (§ 190.3, factor (i).) ■■■ Defendant contends that the prosecutor committed misconduct in arguing that defendant's age (one month shy of twenty-one at the time of the crime) could be considered as an aggravating factor.

The prosecutor prefaced his comments regarding age by stating his belief that defendant was relying on his youthful age as a *mitigating* factor. He told the jury, "[T]here is nothing in the law that says because somebody is young that all of a sudden it is mitigated. *That is your decision.* Now what can you say about the age of the defendant? You can look at him and say, 'Well, he looks young to me. Therefore it is mitigated. What he did is not so bad.'" (Italics added.) He went on to argue why, in his view, the evidence failed to support age as a circumstance in mitigation, concluding: "The defendant may be young, . . . but his youth doesn't *mitigate* the fact that he places no value whatsoever on human life." (Italics added.)

Initially, we note that defendant failed to object to the prosecutor's comments regarding age, or to request an appropriate admonition. Accordingly, to the extent he is arguing "misconduct," he has waived the objection on this ground on appeal. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 788; *People* v. *Green, supra,* 27 Cal.3d at p. 34.)

We recently stated that "mere chronological age, a factor over which one can exercise no control, should not of itself be deemed an *aggravating* factor." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 789.) On the other hand, "mere chronological age of itself should not be deemed a mitigating factor. Age alone is plainly 'a factor over which one can exercise no control' (*Rodriguez, supra,* at p. 789) and as such is not relevant to the issue of penalty. . . . [¶] In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].)

Here the prosecutor did not affirmatively declare that defendant's "mere chronological age" of almost 21 years weighed in favor of the death penalty. (*Rodriguez, supra,* 42 Cal.3d at p. 789.) His remarks "reasonably may be viewed as merely arguing the inapplicability of a mitigating factor, rather than seeking to penalize defendant by reason of his age." (*People* v. *Ghent, supra,* 43 Cal.3d at p. 775.)

17. *Dual Use of the Instant Crimes*

 Defendant contends the trial court erred in failing to modify CALJIC No. 8.84.1 sua sponte to make clear that section 190.3, factor (b) (criminal activity involving force or violence), and factor (c) (prior felony convictions), applied only to "other crimes" and not the crimes for which he was convicted in the present proceeding.

We have previously rejected this identical argument. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106; see *People* v. *Melton* (1988) 44 Cal.3d 713,

763-764 [244 Cal.Rptr. 867, 750 P.2d 741].) Although defendant correctly observes that factors (b) and (c) pertain only to criminal activity other than the crimes for which he was convicted in the instant proceeding, "[o]n this record . . . there is absolutely no indication that the jury would have understood that the guilt phase crimes came within [factor] (b) or (c)." (*Miranda, supra,* 44 Cal.3d at p. 106.)

Here, as in *Miranda,* "[n]either the judge nor the prosecutor suggested to the jury that the guilt phase crimes were to be considered as aggravating factors under [factor] (b) or (c). The judge simply instructed the jury on the mitigating and aggravating factors in the language of section 190.3." (44 Cal.3d at p. 106.) In his closing argument, the prosecutor went down the list of statutory factors, discussing *under factor (a)* "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." In discussing factors (b) and (c), he noted that no uncharged criminal activity involving force or violence had been presented under the former factor, and he listed the three prior felony convictions which had been admitted under factor (c). Thus, the jury was not misled into believing it could "double count" the instant crimes under factors (a), (b), and (c).

18. *Dual Use of Felony-murder Special Circumstance*

Defendant contends there was an unconstitutional dual use of the underlying facts of the instant crimes both as support for the felony-murder-robbery special circumstance—thereby making him "death eligible"—and as an aggravating circumstance at the penalty phase to impose death.

We have rejected this identical argument in *People* v. *Gates, supra,* 43 Cal.3d at pages 1188-1190. (Accord *Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 579-581, 108 S.Ct. 546, 552-554].)

19. *Automatic Motion for Modification of Sentence*

In every case in which the death penalty is returned, section 190.4, subdivision (e) requires the trial judge to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

Defendant urges four grounds of error in the court's ruling on the automatic motion for modification of sentence: (1) that the trial court improperly found the murder was willful, intentional, deliberate and premeditated; (2) that the court improperly considered as an aggravating circum-

stance defendant's leading or dominant role in the criminal scheme resulting in the victim's death (see *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861]); (3) that the court improperly relied on the probation report; and (4) that the court erred in using the same underlying facts and special circumstances twice—to render defendant death eligible and as a circumstance in aggravation for imposing a sentence of death.

It is abundantly clear, both from the record of the hearing on the motion and the detailed written findings filed by the court, that it carefully reviewed the evidence within the framework of the statutory factors set forth in section 190.3, and made its own independent findings that the aggravating outweighed the mitigating circumstances in this case.

We have previously determined that the evidence amply supported the jury's verdict of willful, premeditated and deliberate first degree murder. (*Ante,* pp. 239-240.) So too did it support the trial court's parallel finding in ruling on the application for modification of sentence.

Secondly, the trial court did not improperly consider the absence of a mitigating factor as an aggravating factor. The court properly weighed the evidence and found defendant was not "under the substantial domination of another person" (Pen. Code, § 190.3, factor (g)), but that he in fact was the dominating force in executing the crimes. The trial court properly found factor (g) inapplicable. In its consideration of the related concerns of factor (j) (whether the defendant was an accomplice and his participation in the offense was relatively minor) the court again weighed the evidence and found that defendant was the dominant actor and that he was personally responsible for killing the victim. With respect to factor (j), the court stated it found "this factor is an aggravating factor rather than a mitigating factor."

Although the court's choice of language was unfortunate in view of *People* v. *Davenport, supra,* 41 Cal.3d 247, there is no error requiring reversal. The evidence, as weighed by the trial judge, clearly showed that defendant dominated his younger companions and that, once the plan to rob and kill the victim was finalized, defendant told Tillery to stay behind, armed himself with his rifle, ambushed the unwitting victim from atop a ledge of rocks, and personally fired the fatal shot. These facts are all "circumstances of the crime" which the trial court was entitled to consider in aggravation (factor (a)). The necessary logical consequence of these facts, that any mitigation under factors (g) and (j) would be nonexistent, does not render it improper for the court to consider these "circumstances of the crime" in aggravation.

Thirdly, we have observed that consideration of a probation report is not relevant to the trial court's determination on an application for

modification of penalty under section 190.4, subdivision (e). (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) Under the statutory provisions the court reviews the evidence presented to the jury which, of course, does not include the probation report. However, as in *Williams,* any error must be deemed nonprejudicial; absent evidence in the record to the contrary, we must assume that the court was not improperly influenced by the report in ruling on the application. (*Ibid.*; cf. *In re Contreras* (1975) 45 Cal.App.3d 549, 555 [119 Cal.Rptr. 757] [appellate court must assume the sentencing court was not influenced by irrelevant matters in the probation report]; *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 915 [104 Cal.Rptr. 170] [same].)

Finally, as already discussed (*ante*, pp. 272-273), there is no merit to the claim that the jury or court, in ruling on the motion, improperly considered the facts of the crimes and special circumstances to both find defendant death eligible and aggravate sentence. (*People* v. *Gates, supra*, 43 Cal.3d at pp. 1188-1190.)

20. *Proportionality Review*

■ Defendant urges that we conduct "intercase" proportionality review—i.e., an examination of whether imposition of the death penalty in his case is disproportionate to the penalties imposed on other persons who have committed similar offenses. It is settled that the Eighth Amendment requires no such comparison. (*Pulley* v. *Harris, supra*, 465 U.S. at pp. 51-54 [79 L.Ed.2d at pp. 41-43]; *People* v. *Rodriguez, supra*, 42 Cal.3d at pp 777-779; *People* v. *Allen, supra*, 42 Cal.3d at p. 1285.)

■ Defendant argues that state and federal proscriptions against "cruel and unusual punishment" require that we conduct "intracase" proportionality review—i.e., an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others. (E.g., *People* v. *Dillon, supra*, 34 Cal.3d at pp. 477-482; *In re Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921].) He argues that his sentence was disproportionate due to (1) the treatment of Tillery (guilty plea to robbery in juvenile court) and Love (life imprisonment for murder), and (2) the "uncertainty" regarding his personal culpability for the crimes.

We conclude, as we did in *Miranda, supra*, 44 Cal.3d at page 118, that "[d]efendant's reliance on *Dillon* is wholly misplaced. The facts of this case bear no similarity to the circumstances in *Dillon,* where an immature 17-year-old defendant, who shot and killed his victim out of fear and panic, was sentenced to life in prison despite the view of the judge and jury that the sentence was excessive in relation to his true culpability. (34 Cal.3d at p. 487.)"

Defendant was convicted on extremely strong evidence that he deliberately, intentionally, and with premeditation, committed a senseless, pitiless murder of an unwitting victim who was unknown to him. The murder occurred in the course of a calculated plan to rob the victim. After the crimes, defendant personally removed money from the victim's wallet, devised a plan to dispose of his vehicle, and removed its stereo cassette player which he gave away to some friends.

In the penalty phase the jury was fully apprised of all the factors properly bearing upon whether defendant was eligible for, and deserved, the death penalty. There was, of course, defendant's relative youth. However nothing in the prior decisions of this court, or of the federal courts, suggests that his punishment is constitutionally disproportionate to "the offense" or "the offender." (*People* v. *Melton, supra,* 44 Cal. 3d at p. 771.)

## III. CONCLUSION

We have found no prejudicial error at either the guilt or penalty phases of defendant's trial. The financial-gain special circumstance is set aside. In all other respects the judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the result. This is a troubling case because, as Justice Mosk's dissent suggests, defendant is not typical of those persons sentenced to death. I cannot, however, join his opinion; I do not believe it is unconstitutionally disproportionate to impose a more severe sentence upon defendant, the actual killer, than upon his accomplices. Instead the problem, as I see it, is one of disparate sentencing between different regions of this state.

Under the United States Constitution a death penalty law must provide a meaningful basis for distinguishing the few cases in which that penalty is imposed from the many in which it is not. (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759]; see *Spaziano* v. *Florida* (1984) 468 U.S. 447, 460, fn. 7 [82 L.Ed.2d 340, 352, 104 S.Ct. 3154].) California's 1978 statute does not perform that function efficiently. Describing 19 different special circumstances which render a defendant eligible for death, it sweeps so broadly that most murderers are subject to the death penalty, and only a few excluded.

But capital trials are far more expensive than ordinary murder trials, and prosecutors in the larger, urban counties where most murders occur do not have the resources to seek the death penalty against more than a few of the eligible defendants. They must do what the statute does not: establish guidelines to distinguish those few cases in which the death penalty will be sought

from the many in which it is not sought. Those guidelines and practices vary so greatly from county to county that we have, in effect, 58 death penalty laws, and in many cases whether a defendant gets the death penalty will depend on where he committed the crime.

Under the guidelines established in most of the urban counties the murder in the present case would not have been prosecuted as a capital case. Unfortunately for defendant, he committed his crime in a rural county where murders are less frequent, and in which it is possible for the prosecutor to seek a death penalty in all or most death-eligible cases. No doubt the prosecutor acted within his authority in seeking the death penalty. But when we compare this case to the pattern of murder cases from the urban counties of this state, the imposition of the death penalty here seems an aberrant result.

**MOSK, J.**—I concur in the affirmance of the judgment as to guilt, but I dissent from the affirmance of the judgment as to penalty.

After review of the record of the guilt phase I find no prejudicial error. It is, however, with some reluctance that I agree with the majority that the trial court did not err by denying defendant's motion for change of venue. To hold otherwise on the relatively meager showing made by defendant would be tantamount to a determination that the residents of this state's less populated counties cannot act as fair and impartial jurors in a capital trial. Such a determination would be unwarranted and unjustified.

I recognize that in certain kinds of cases there may indeed be a reasonable likelihood that a fair and impartial trial cannot be had in a sparsely populated county. In those cases, of course, the court must order a change of venue on the defendant's motion and proceed to transfer the action (Pen. Code, § 1033) or—perhaps better—to import a jury (*id.*, § 1036.7; see generally *Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 595-596 [194 Cal.Rptr. 492, 668 P.2d 799] (conc. opn. of Mosk, J.); *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 958-959 [187 Cal.Rptr. 455, 654 P.2d 225] (dis. opn. of Mosk, J.)). This, however, is not such a case. Accordingly I believe the trial court's denial of defendant's change-of-venue motion was not error.

I cannot agree with the majority, however, that defendant may be put to death without offense to the Constitution. In *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 306-308 [95 L.Ed.2d 262, 287-289, 107 S.Ct. 1756, 1774-1775], the United States Supreme Court held clearly, albeit impliedly, that a defendant sentenced to death can show disproportionality violative of Eighth Amendment principles by demonstrating that other similarly situated defendants did *not* receive the death penalty, and that such inconsistency in

results is not based on objective circumstances of the crime and the criminal. In my view, defendant makes such a showing here.

First, it is undisputed that the results are plainly inconsistent: defendant was sentenced to death, Love received a term of imprisonment for 25 years to life, and Tillery was committed to the Youth Authority. Second, the inconsistency cannot be deemed to be based on objective circumstances. The actions of Love and Tillery were scarcely less serious than those of defendant: Tillery devised and actively promoted the criminal scheme and Love executed it jointly with defendant. More important, the mental states of Love and Tillery were no less blameworthy than that of defendant: they, like him, intended that a killing take place.

Under these circumstances, I would hold it unconstitutional to execute the sentence of death on defendant. Therefore, I would exercise our authority under Penal Code sections 1260 and 1181, subdivision 7 (see, e.g., *People v. Lucero* (1988) 44 Cal.3d 1006, 1034-1036 [245 Cal.Rptr. 185, 750 P.2d 1342] (conc. and dis. opn. of Mosk, J.)) and vacate the judgment as to penalty and remand the cause to the trial court with directions to impose a sentence of life imprisonment.

Appellant's petition for a rehearing was denied February 2, 1989, and the opinion was modified to read as printed above.